[No. 15784.  Department Two.  September 3, 1920.]

# National Bank of the Republic, *Appellant*, v. Walker D. Hines *et al.*, *Respondents.*[1]

Banks and Banking (31)—Drafts—Deposits for Collection— Ownership of Draft. It is conclusively presumed that a bank becomes the absolute owner of a draft where, without any other agreement, it is indorsed and delivered to the bank by a regular customer whose checking account is given credit for the full amount; and it is immaterial that the bank reserved the right to charge back the draft against the customer's account in case of nonpayment.

Carriers (23)—Bills of Lading—Wrongful Delivery of Goods. Where a bank held bills of lading and the property represented thereby as collateral security for the payment of a draft purchased, a delivery of the property by a carrier without surrender of the bills of lading, and acceptance by a third person, was wrongful as against the bank, since no person other than the bank had a right to the bills of lading or the property until the amount it was entitled to receive had been paid.

Same (26). Where property represented by a bill of lading and held by a bank as collateral security for payment of the draft and bill of lading was wrongfully converted, the measure of the bank's damages is the value of the property, up to the amount of the draft, regardless of the fact that in purchasing the draft an overdraft of the seller was paid to the bank.

Same. In such case, the bank can recover the value of the property, without deduction of the freight paid to release the property, where the defendant received the amount of the freight from another when it wrongfully converted the property and sold it to defendant.

Same (23)—Wrongful Delivery of Goods—Bills of Lading— Rights of Innocent Purchaser. In such a case, the consignee of the property represented by the bills of lading, though having paid for the property, is not entitled to possession as against the bank, where the seller had possession of the property, the bills of lading were issued to him and he delivered them to the bank, the bank having no knowledge of the arrangement between the seller and the buyer.

Appeal by plaintiff from a judgment of the superior court for King county, Dykman, J., entered November

[1]Reported in 192 Pac. 899.

29, 1919, upon findings favorable to the plaintiff in part, in an action for conversion, tried to the court. Reversed. ·

*Donworth, Todd & Higgins,* for appellant.

*Reynolds, Ballinger & Hutson,* for respondent Alaska Junk Company.

*C. H. Winders,* for respondent Hines.

BRIDGES, J.—This action was brought by the appellant against the respondent Hines, as Director General of railroads, to recover the value of three car loads of scrap iron. The amount sued for is $2,080. Subsequently to the bringing of the action, the respondent Alaska Junk Company was made a party defendant at the demand of the Director General. The case was tried to the court without a jury, and resulted in a judgment in favor of the appellant and against the respondent in the sum of $868.45, and also a judgment in favor of the respondent Hines and against the junk company in a like amount. The judgment further provided "that if any other further or additional judgment in this cause be entered in favor of the plaintiff and against said defendant Walker D. Hines, Director General of railroads, as operating the Northern Pacific Railway, then it is further ordered, adjudged and decreed that he do have, as against the Alaska Junk Company, a judgment for any additional amount which may be entered against him in favor of the plaintiff, on account of any of the matters and things involved in this action." It is from this judgment that the bank has appealed.

The following is the substance of the facts: The appellant is a banking institution, doing business at Salt Lake City, Utah; the respondent Walker D. Hines

was, at the time of the commencement and trial of this case, Director General of railroads; the respondent Alaska Junk Company is a corporation doing a general junk business in the city of Seattle, Washington. In June, 1918, the junk company purchased, or agreed to purchase, from one Rosenblatt, doing business in Salt Lake City, approximately 800 tons of junk to be delivered at Seattle. Prior to the delivery, the junk company paid Rosenblatt all or a substantial portion of the contract price. There was an understanding between them that the junk was to be. shipped to the Alaska Junk Company by straight bill of lading; none of the other parties to the action, however, had any knowledge of the contract.

During the last days of August and the first few days of September, 1918, the respondent Hines, operating the Northern Pacific Railway, received from Rosenblatt, at Phillipsburg, Montana, four cars loaded with scrap iron, for transportation to Seattle. Respondent Hines issued to Rosenblatt four separate bills of lading, one covering each car, each showing consignment to Rosenblatt at Seattle, notify Alaska Junk Company, and each showing the weight of the car, subject to correction. The fourth bill of lading figures in this case only indirectly. The railroad company did not have at the places of shipping these cars any facilities for weighing the cars and their weights were estimated. When the cars reached Missoula, however, on their way to Seattle, they were weighed and found to contain a less number of pounds than those designated in the bills of lading.

Thereafter, and on September 10, 1918, Rosenblatt drew a draft on the Alaska Junk Company in favor of the appellant for $2,730, and attached thereto the four order bills of lading. This draft, with bills of lading attached, was delivered to the appellant at its banking

house, and at the same time the appellant gave Rosenblatt's private account at the bank credit for the full amount of the draft. There was no agreement of any character between the parties concerning the draft and bills of lading other than such as would arise from the transaction as above outlined. Rosenblatt was a regular customer of the bank. In due course the appellant sent the draft, with bills of lading attached, to the Union National Bank at Seattle for the purpose of collection. The last named bank presented the draft, together with the attached bills of lading, to the respondent junk company, which refused to honor the draft or take up the bills of lading. They were then returned by the Seattle bank to the appellant at Salt Lake City. Shortly thereafter the junk company wired Rosenblatt to come to Seattle. When he arrived there the junk company took him to task about his conduct in drawing the draft and making the shipment by order bills of lading. It contended to him that the agreement was that the shipment was to be made direct to them because they had already paid him the purchase price of the shipment. They then procured Rosenblatt to make an order to the railroad company to release the three cars to the junk company (some other disposition, not shown by the record, having previously been made of the fourth car). Thereafter the cars were so released to the junk company without the bills of lading being surrendered. In order to get the cars the junk company was required to, and did, pay the freight thereon in the sum of $560.06. The total weight of the three cars, according to the bills of lading, was 160,000 pounds; the actual weight, as determined by the railroad company at Missoula, was 138,100 pounds. The actual value of the three cars at Seattle was $2,243.88. Prior to the bringing of this suit, the appellant had

been paid $650 on account of the fourth car, which is not involved here, and which amount was credited to the draft, leaving unpaid thereon $2,080. At the time the draft was drawn and delivered to the appellant, Rosenblatt had overdrawn his account at the bank in the sum of $849.15. Prior to the time the bank received the draft for $2,730, it had cashed another draft, (without bill of lading attached) drawn by Rosenblatt for $1,000, and had credited his account at the bank with that sum, but on the date the draft in question here was drawn, the $1,000 draft was returned uncollected, and the bank charged that amount, to wit, $1,000, back to Rosenblatt's account. At the time the bank received notice that the draft involved here had been dishonored, Rosenblatt had to his credit in the bank $12.40. It would seem that the trial court arrived at its judgment in the sum of $868.45 in the following manner: It deducted from the face of the draft in suit, to wit, $2,730, Rosenblatt's overdraft of $849.15 and the amount of the dishonored $1,000 draft, making a total of $1,849.15, and added to this sum the $12.40 still to Rosenblatt's credit, thus making a deduction of $1,861.55 from the face of the draft, to wit, $2,730, leaving $868.45, for which amount judgment was given.

The elaborate briefs of the various parties have attacked the questions involved here from various angles. It is contended by the appellant that it was the purchaser and became the absolute owner of the draft and the bills of lading, and that, therefore, the respondent Hines has unlawfully appropriated its property and it is entitled to recover the full amount remaining unpaid on the draft. It further contends that the condition of Rosenblatt's private account with the appellant bank has nothing to do with the case. The respondent junk company contends that the appellant took the draft

only for collection and that it did not become the owner thereof nor of the bills of lading, and that appellant actually advanced only $868.45 in cash for or on the draft, the remainder of the amount going to discharge the Rosenblatt overdraft, and consequently appellant has been injured only in the sum of the difference between the amount of the draft and the amount which went to pay the overdraft, to wit, $868.45, which is the amount of the judgment given by the trial court. The railroad company and the junk company contend that, in any event, judgment cannot be given appellant for a sum greater than the value of the scrap iron at Seattle, less the freight thereon. We do not find it necessary to follow the various arguments in detail. The case and the facts thereof very closely resemble, and are largely controlled by, the case of *Vickers v. Machinery Warehouse etc. Co.*, 111 Wash. 576, 191 Pac. 869. Had that case been decided at the time of the presentation of this case to us, doubtless the briefs and arguments of the various parties to the case would have been materially different. In that case we said:

"Much the greater number and weight of authorities is to the effect that, where one brings a check or draft to his bank, and such check or draft is made payable to the bank or is unrestrictedly indorsed to it, and requests that the amount thereof be put to his credit subject to his private check, and the bank complies therewith, and nothing else is said or done, it will be conclusively presumed that the bank has become the unqualified and absolute purchaser and owner of the check or draft, and consequently the absolute and unqualified owner of any proceeds to be derived therefrom. We think the theory is sound. It agrees with the idea and view generally accepted by business; it is the natural and unstrained construction of the action of the parties, and has the additional virtue of definitely fixing and at once defining the legal relationships of the parties in many check and draft transactions."

The facts bring this case squarely within what was said in the *Vickers* case, and, under the rule of that case, it must here be held that the appellant became the absolute owner and purchaser of the draft given to it by Rosenblatt. Nor can the fact that the appellant charged back to Rosenblatt's account the amount of the dishonored $1,000 draft, and reserved the right to charge back the draft involved in this action in the event it should not be paid, argue against the theory that appellant became the owner by purchase of the draft. We so expressly held in the *Vickers* case, *supra*.

We do not find it necessary to here decide whether the appellant became the owner of the bills of lading and the property they represented, or whether it held them and the property as collateral security for the payment of the draft which it had purchased. The result in this case must be the same whichever way we might decide that question. We will therefore assume, for the sake of argument, the position most favorable to the respondent, to wit, that the bank held the bills of lading and the property represented thereby as collateral security only. Under this theory it cannot be contended that any person other than the appellant had any right to these bills of lading until the amount it was entitled to receive was paid, and it cannot be argued that the respondent Hines did not wrongfully and unlawfully surrender to the junk company the property represented by the bills of lading, or that the latter did not receive the junk wrongfully, at least as to appellant.

The further question, therefore, is, What is the amount of appellant's injury because of such wrongful acts? Unquestionably it is the amount which the appellant would have been entitled to demand on the draft. We cannot agree with the trial court that such amount is the difference between the face of the draft and the

amount of Rosenblatt's overdraft.  The purchase of
the draft in suit was a separate and independent act;
it had nothing to do with, and no connection whatsoever
with, any other business transactions between appellant
and Rosenblatt.  So far as the respondents are con-
cerned, the appellant stood as the purchaser and abso-
lute owner of the draft, and was entitled to collect the
whole of the same before any person could get lawful
possession of the bills of lading or the property which
they represented.  Rosenblatt had a right to pay what
he owed the bank out of the money he received from the
sale of the draft; and this is what was done when the
bank charged back to Rosenblatt's private account the
amount the latter owed it.  The transaction is no dif-
ferent than if the bank had paid Rosenblatt the cash
for the draft and the latter had then, out of such cash,
paid the bank what he owed it on account of overdraft.
To hold otherwise would be to deprive the bank of its
rights as a purchaser and owner of the draft.  From
this it must follow that the appellant was entitled to
receive the value at Seattle of the three cars of junk,
up to the amount of its draft, to wit, $2,080.  The trial
court found that the value of the scrap iron at Seattle,
after the payment of the freight, was $2,243.88.  The
testimony on the question of value is in a very unsatis-
factory condition.  We are unable to find anything to
justify this finding of the court.  Our conclusion is
that the testimony shows that the value at Seattle of
the material in question was the amount found by the
court, without or before the payment of the freight.
In other words, that the value after freight paid was
$1,684.44.

Both of the respondents contend that the most
the appellant would be entitled to recover would
be the value after deducting the freight, because, it is

argued, if the car loads of scrap iron had been turned back to it, it would have been required to pay the freight; that the amount of the freight money was a part of the value at Seattle. But it will be remembered that the appellant has sought recovery here only against respondent Hines, and that he had received his freight money before this suit was commenced, the same having been paid to him by the Alaska Junk Company when it wrongfully (at least as against the appellant and respondent Hines) obtained possession of the cars. It seems to us, therefore, to follow necessarily that the respondent Hines is in no position to contend that he should be liable only for the value less the freight. Indeed, if the junk company had paid the draft and become rightfully possessed of the bills of lading, and thereby had become rightfully entitled to the cars, it would have been required to pay the freight bill of the respondent Hines before it could have gotten possession of the material.

The respondent junk company contends that it has paid for the junk and was the owner of it, and therefore rightfully obtained possession of it. While this may be true as between it and Rosenblatt, it is not true as between it and the appellant. The latter did not know anything about the arrangements between the junk company and Rosenblatt. Rosenblatt had possession of the junk, the bills of lading were issued to him and he delivered them to the appellant. Our conclusion, therefore, is that the appellant is entitled to recover, up to the amount of its draft, the value at Seattle of the three car loads of scrap iron without deduction for freight. Such value is $2,243.88, being an amount in excess of that found to be owing to appellant on its draft.

The judgment is reversed, and the cause remanded with directions to enter judgment in favor of the appel-

lant and against respondent Hines in the full amount sued for, and also a judgment in favor of respondent Hines and against respondent junk company for a like amount.

Holcomb, C. J., Fullerton, Mount, and Tolman, JJ., concur.