ST. REGIS PAPER COMPANY,
a corporation, Plaintiff,

v.

Mrs. Ola AULTMAN, Individually and as Executrix of the Will of Neila Aultman Andrews, Andrew J. Aultman and the Jordan Company, a Georgia Corporation, Defendants.

Civ. A. No. 908.

United States District Court
M. D. Georgia,
Albany Division.

March 23, 1967.

Jones & Sims, Pensacola, Fla., and Sam Brown Lippitt, Albany, Ga., for plaintiff.

Tillman, Brice, McTier & Coleman, Valdosta, Ga., Perry, Walters, Langstaff & Lippitt, Albany, Ga., and Swift, Pease, Davidson & Chapman, Columbus, Ga., for defendants.

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ELLIOTT, District Judge.

St. Regis Paper Company brought this diversity Declaratory Judgment proceeding to judicially determine its timber cutting rights under a lease and timber sales contract dated December 29, 1952, effective January 1, 1953 and expiring December 31, 2012.

The Georgia contract granted to St. Regis certain rights and imposed upon it certain obligations with respect to the production, care and cutting of, and payment for, timber growing and to be grown on the leased property located in Worth County, Georgia.

In general terms, the controversy involves a difference of opinion between St. Regis and the defendant owners of the subject property as to whether St. Regis has the right during 1967 and the remaining years of the contract to cut what is referred to as a "back-log" of timber which St. Regis claims that it paid for but did not cut during the first fourteen years of the contract.

In this connection, St. Regis contends that during the first fourteen year period (not including the last three months in 1966) it *paid for* 259,594.25 cords of timber; that during the same period it cut only 179,336.57 cords; and that under the terms of the contract it is now and during the remaining years thereof entitled to cut as a "back-log" the 80,-257.68 cords so *paid for* but not cut, without the payment of any additional consideration.

On the other hand, the owners assert that St. Regis only paid for and in fact cut all of the timber growth on the property during the first fourteen years, and that there is therefore no existing "back-log" under the terms of the contract which St. Regis is entitled to cut.

Both St. Regis and the owners have filed Motions for Summary Judgment.

The Court has concluded that the Motion for Summary Judgment filed by the owners should be granted; and consequently the Motion of St. Regis should be denied.

The contract is a lengthy document, covering some 30 pages and containing 35 numbered paragraphs each of which carries an identifying title. However, it will not be necessary to set out the entire contract in order to dispose of the question presented. Aside from Paragraph 13 which specifically deals with and is entitled "CUTTING BACK-LOG", the other paragraphs referred to by counsel in their briefs and oral argument are: 2. PURCHASE PRICE; 7. FOREST MANAGEMENT; 8A. LUMP SUM SALE OF 29,000 CORDS; 8B. CUTTING RIGHTS FIRST FOURTEEN YEARS; 9. SURVEY; 10. CRUISES; 11. CUTTING ANNUAL GROWTH, AFTER FOURTEEN YEARS; 12. QUARTERLY PAYMENTS; 14. CUTTING REDUCED BY FIRE; and 26. CONTINGENCIES.

### ANNUAL CUTTING RIGHTS FIRST FOURTEEN YEARS

Under Paragraph 8A St. Regis purchased and the owners sold 29,000 cords of timber to be cut at the rate of 5,800 cords a year for the years 1953 through 1957. In connection with this sale it was provided that: "No provision of this agreement shall be construed in any

way to restrict or limit the unconditional right of the Purchaser to cut and remove the above pulpwood at the rate specified after the payment therefor has been made to the Sellers."

In Paragraph 8B the parties agreed "that during the first fourteen years the lands," (not including the cleared lands to be planted with trees by St. Regis) "if operated in accordance with good forestry practices and pursuant to the provisions of this contract, in addition to the pulpwood sold under the provisions of Paragraph 8A * * *, should produce * * * timber growths equal to or greater than the quantities set opposite the respective years in the following schedule:". Following this is a schedule of the agreed predicted growth for each of the years 1953 through 1966,—the growth as shown by the schedule for 1953 being 9,450 cords and gradually increasing to 22,615 cords for the year 1966. It was then provided that during each of these years St. Regis would "have the right to cut and remove * * * up to the number of cords of pulpwood, indicated by the * * * schedule with respect to such year;" but with the proviso "that should the * * * growth during such year actually amount to less than the quantity so indicated, the quantity of pulpwood * * * which Purchaser is given the right to cut * * * during or with respect to such year shall be reduced to the amount of such actual * * * growth."

In Paragraph 9 it was provided that the predicted growth set forth in the schedule contained in Paragraph 8B was based on the assumption that the described property exclusive of "cleared land" contained 25,200 acres, and that if a survey should establish more or less acreage then the predicted growth shown in the schedule was to be changed to an amount "which bears the same ratio to said number of cords as the total acreage thus determined, of said described lands, exclusive of said 'cleared lands', bears to 25,200".

## ANNUAL CUTTING RIGHTS AFTER FIRST FOURTEEN YEARS

In Paragraph 11 it was provided that after the first fourteen years St. Regis would "have the right to cut * * * from said lands the number of cords of pulpwood * * * last established pursuant to Paragraph 10 * * * as the current annual rate of * * * growth of timber upon said lands".

Under Paragraph 10 it was stated that if in 1966 the parties could not by agreement establish the annual rate of growth of timber then being produced upon the lands for 1967 and subsequent years, determination of the "current rate of growth * * * of timber upon said lands in terms of the number of cords of pulpwood per year", would be made by a cruise of the timber, and it was agreed that "the annual rate thus established shall be conclusive for the purposes of this contract". Either party could thereafter require a new determination of rate of growth, but not until the expiration of five years after a previous determination.

## PAYMENTS TO BE MADE BY ST. REGIS

The consideration for the 29,000 cords was $100,000.00, payable on or before January 20, 1953.

Paragraph 2 provided that St. Regis would buy and have the right to cut timber "in the amount hereinafter more specifically set out during each year of the * * * term," and that "subject to the provisions hereinafter contained," and except with respect to the 29,000 cords sold under Paragraph 8A, St. Regis was to pay the owners $3.75 a cord subject to adjustments based upon an increase or decrease of the wholesale price index published by the United States Department of Labor, or a minimum of $20,000.00 in each of the first fourteen years, and a minimum of $40,000.00 a year thereafter.

However, the contract further provided with respect to the consideration to be paid by St. Regis in connection with

its cutting rights in the first fourteen years, that whether or not St. Regis cut and removed "The quantities of timber indicated in the schedule or any part thereof," it would nevertheless pay to the owners on January 1, 1953 and thereafter quarterly during the first fourteen years, "as the purchase price of the timber authorized to be cut during the year such payments are due, a sum equal to one-fourth (¼) of the purchase price of the quantity of wood * * * growth above set forth in the schedule of this Paragraph 8B for such year".

Then with reference to payments to be made after the first fourteen years, Paragraph 11 provided that whether or not St. Regis cut the annual rate of growth in any year as established by a cruise, it would nevertheless make quarterly payments to the owners equal to one-fourth (¼) of the purchase price "of the quantity of pulpwood * * * which" St. Regis "is authorized under the provisions of this paragraph to cut * * * during the year in which such payment is made".

Paragraph 12 provided that the quarterly payments required by Paragraphs 8B and 11 were to be based upon $3.75 a cord until a different price was applicable in accordance with the provisions of Paragraph 2, that the quarterly payments were to be based upon the most recent price applicable and that these payments were subject to adjustment, under Paragraph 2, after the end of the year with respect to which they are made.

## CUTTING REDUCED BY FIRE

Under Paragraph 14, if 300 acres or more of the land was burned over and damaged by fire between March 15 and December 1 of any year, then during the succeeding ten (10) years the amount of timber that St. Regis was authorized to cut was to be reduced by one cord per acre of land so burned or damaged "but the obligation of the Purchaser to make the payments herein required shall not be reduced".

## THE "BACK-LOG" PROVISION

Paragraph 13, out of which this controversy directly arises, provides: "Should Purchaser during any one or more calendar years not cut * * * timber in the amount Purchaser is required to pay for with respect to such year, then Purchaser shall be entitled to cut * * * the timber so paid for but not cut * * * in prior years; provided that the Purchaser shall not be entitled to cut * * * during any current year applying the same against its credit created by payments in prior years until Purchaser shall have cut * * * the allowable cut for such current year as provided and fixed by the provisions of Paragraph 8B or Paragraph 11 hereof. Nevertheless, Purchaser's right to cut * * * timber authorized to be cut under Paragraph 8B shall expire upon the termination of the ten (10) year period next following the year with respect to which such timber is paid for * * * and Purchaser's right to cut * * * any other timber authorized to be cut under this contract shall expire upon the expiration or termination of this contract or upon the expiration of the six (6) year period next following the year with respect to which such timber is paid for, whichever shall first occur."

## FOREST MANAGEMENT

Paragraph 7 imposed upon St. Regis the obligation, at its own expense, to manage and operate the lands and protect and utilize the timber "in accordance with good forestry practices from time to time prevailing, including but not limited to, the restoring of areas cut over or burned, and with such fire protection as good forestry practices may require, and in such manner that the average annual * * * growth of timber upon said lands, shall not be less than the amount of timber cut * * * annually".

## CONTINGENCIES

Under Paragraph 26 St. Regis and the owners were relieved of their respective obligations if they could not be per-

formed due to war, acts of the public enemy, labor strikes on the part of St. Regis' employees engaged in St. Regis' operations upon the lands under the contract, governmental restrictions or prohibitions, condemnation of the lands, exploration for or mining, drilling, producing oil, gas or minerals or operations incident thereto, disease, blight, insect or similar infection of timber; and in such event "the payments provided for in Paragraphs 8B and 11 shall be reduced in the same proportion and for the same length of time that the amount of timber permitted to be cut * * * is reduced by the aforesaid events or casualties".

The undisputed facts with respect to the activities under the contract from 1953 through the third quarter of 1966, including the scheduled estimated growth under Paragraph 8B as amended, the actual growth, the amount of timber cut not including the 29,000 cords, and the amounts paid by the Plaintiff to the Defendants are shown in the following chart:

| Year | Scheduled Estimated Growth Para. 8B | Actual Growth | Amount of Timber Cut Not Including 29,000 Cords | Applicable Price Per Cord Under Para. 2 | Total Payment |
|---|---|---|---|---|---|
| 1953 | 9,450 | 9,450 [3] | 11,107.51 [5] | $3.75 | $ 35,343.00 |
| 1954 | 10,650 | 10,650 | 24,349.59 [5] | 3.75 | 39,937.50 |
| 1955 | 11,850 | 11,850 | 32,114.07 [5] | 3.75 | 44,556.00 |
| 1956 | 13,050 | 13,050 | 1,839.32 | 3.75 | 50,629.11 |
| 1957 | 14,250 | 14,250 | 7,623.41 | 3.9946 | 56,923.00 |
| 1958 | 21,250 | 21,250 | 15,798.44 | 4.0489 | 86,039.00 |
| 1959 | 23,050 | 9,162 | 9,091.23 | 4.0591 | 93,562.27 |
| 1960 | 23,800 | 9,162 | 8,196.09 | 4.0625 | 96,590.00 |
| 1961 | 23,800 | 9,162 | 10,307.50 | 4.0455 | 96,185.81 |
| 1962 | 23,728 [1] | 9,162 | 8,961.23 | 4.0591 | 96,509.15 |
| 1963 | 22,591 | 12,000 [4] | 12,407.82 | 4.0455 | 91,391.89 |
| 1964 | 22,591 | 12,000 [4] | 11,953.38 | 4.0557 | 91,622.35 |
| 1965 | 22,591 | 12,000 [4] | 15,571.45 | 4.1338 | 92,063.43 |
| 3rd Qtr. 1966 | 16,943.25 [2] | 9,000 [4] | 10,015.53 | 4.1338 | 70,040.06 |
| | 259,594.24 | 162,148 | 179,336.57 | | 1,041,392.57 |

1. This amount was originally 23,800 but by agreement was reduced to 23,728.

2. These figures were originally 22,615 but were changed by agreement. The estimated growth figure for 1966 was also 22,591. The figure of 16,943 represents ¾ of the annual figure. The other figures with respect to 1966 also reflect matters relating to the first three quarters.

3. No growth study was made until 1958 and for the years 1953–1958 the parties disregarded whatever difference there may have been in those years between the *scheduled estimated growth* and the *actual growth* and considered the *actual growth* to be the same as the *scheduled estimated annual growth*.

4. In 1963 the parties abandoned the actual growth figure established in 1958 and agreed on an *arbitrary actual growth figure* of 12,000. This agreement was extended to the years 1964, 1965 and 1966. The 9,000 figure used under the actual growth for 1966 represents the the annual agreed growth figure of 12,000 reduced to 9,000 as representing ¾ of the year.

5. The cut in excess of the scheduled amounts in 1953, 1954 and 1955 was agreed to with the understanding that the overcut would be credited against timber authorized to be cut in subsequent years.

The "back-log" claimed by St. Regis begins in 1959 when the amount of timber cut began to fall below the scheduled amount, and this situation continues through the third quarter of 1966 until the claimed "back-log" reaches slightly over 80,000 cords.

In providing for the right to cut a "back-log" of timber, the contract in Paragraph 13 refers to *"timber* in the amount *purchaser is required to pay for* with respect" to any one or more calendar years, but which it did not cut; the "allowable cut" for each calendar year which must be cut in a calendar year before St. Regis becomes entitled to cut a timber "credit created by payments in prior years"; and "timber *authorized to be cut*" under Paragraph 8B which must be cut within ten (10) years next following the year with respect to which such timber is *"paid for".*[6]

Thus, a "back-log" has the characteristics of timber *paid for* in a preceding year which St. Regis was *authorized to* but did not *cut* and timber which can only be cut *after* St. Regis has cut the *allowable cut* for the current year. Further, referring back to Paragraph 8B, it appears that St. Regis was given the right to cut only the actual growth up to but not in excess of the scheduled amount; and, while the amount to be paid by St. Regis was to be determined on the basis of the number of cords scheduled and agreed to in Paragraph 8B multiplied by the then existing applicable price per cord under Paragraph 2, it was nevertheless expressly provided that this constituted the *"purchase price of the timber authorized to be cut* during the year such payments are due".[6]

It would seem to necessarily follow from the foregoing that a "back-log" which comes about in one year, and may be cut in a subsequent year, is timber which St. Regis was in fact authorized to cut but did not cut in the preceding year.

Thus, in order to determine whether a "back-log" exists with respect any one of the first fourteen years, the amount of timber actually cut would be compared with the actual growth up to but not in excess of the scheduled amount and not with the scheduled amount where the latter was in excess of the growth. If St. Regis did not cut the actual growth of timber up to but not in excess of the scheduled amount, the deficiency could, under certain conditions, be cut as a "back-log" in subsequent years. If the timber cut was not less than the amount that it was so authorized to cut, that is to say, if St. Regis cut all of the growth which took place during the fourteen year period, then St. Regis would have cut all that it was entitled or authorized to cut in those years, and there would be no deficiency in its cut which could be cut in future years.

▇ The term "authorized to be cut" when applied to the timber rights of St. Regis can mean no more or less than the amount of timber which St. Regis was actually entitled to take from the land in a given year. This would be the scheduled amount if this was less than the growth; or it would mean the actual growth if this was less than the scheduled amount.

▇ The argument that the expression "authorized to be cut" in Paragraph 8B (the purchase price of which was represented by the amount to be paid as set out therein) and as used in Paragraph 13, refers to the scheduled amount of timber, even though (as the admitted facts disclose) this was greater than the actual growth, is untenable. No valid reason appears which would justify interpreting the term "authorized to be cut" to mean that which was *not* authorized to be cut. In searching for the intention of the parties, words are to be given their ordinary meaning unless they be words of art which may have acquired some different connotation. Code of Georgia, 1933, § 20–704(2); Wolverine Ins. Co. v. Jack Jordan, Inc., 213 Ga. 299, 99 S.E.2d 95; Chelsea Corp. v. Steward, 82 Ga.App. 679, 62 S.E.2d 627.

**6.** Emphasis supplied by the Court.

It is an admitted fact that during the initial fourteen year period the growth was less than the scheduled amount and that St. Regis cut all of the actual timber growth during that period. This, as the contract states, was all that was authorized to be cut. This is what St. Regis paid for,—nothing more. It may have paid the equivalent of the scheduled amount multiplied by the correct price per cord as provided for in Paragraph 2, but the amount so paid, according to the plain terms of the contract, was the consideration for, and only for, the timber which St. Regis was authorized to take from the property during that year, which, as shown by the admitted facts, was the amount of actual growth, since this was less than the scheduled amount. Thus, under the facts, it cannot be concluded that the scheduled amount was paid for or authorized to be cut, which are essential characteristics of a "back-log". On the other hand, uncut growth not in excess of the scheduled amount would possess these qualities.

To illustrate the point, assume that in a calendar year in the first fourteen years the scheduled amount was 20,000 cords, the growth 10,000 cords, and St. Regis cut 5,000 cords. St. Regis would have paid for, and would have been authorized to cut, 10,000 cords. Since it cut only 5,000 cords, it would have been entitled under the conditions stated in Paragraph 13, to cut the remaining 5,000 cords in a subsequent year. In such case, a 5,000 cord "back-log" was created, not a 15,000 cord back-log as contended for by counsel for St. Regis. To bring the illustration in line with what occurred in this case, if St. Regis had cut 10,000 cords, then it would have cut all the timber it paid for and was authorized to cut, and there would have been no "back-log" with respect to such year.

Under the foregoing, where in any year there is uncut growth not including growth in excess of the scheduled amount, St. Regis in a subsequent year could comply with the condition in Paragraph 13 by cutting in the subsequent year the growth up to the scheduled amount (the amount authorized to be cut and to be paid for in that year) and *then* cut the back-log of uncut growth and this could be done without in any way impinging upon the provisions in Paragraph 7 relating to "Forest Management" which in substance prohibits St. Regis from cutting more than the average annual growth.

It is the contention of counsel for St. Regis, at least as to the difference in any one of the first fourteen years between the growth (all of which St. Regis cut) and the greater scheduled amount (their claim with respect to a "back-log"), and with respect to the cutting thereof in a year after the first fourteen years (subject to the limitation provision), that the provision of Paragraph 13 that a back-log is not to be cut until St. Regis has cut the "allowable cut" for the year in which the back-log is cut, does not mean that St. Regis must cut all of the growth in that year and *then cut* the "back-log", but that this provision simply means that in the year back-log is to be recovered St. Regis must cut the "allowable cut" or growth for that year,—in other words, that the "back-log" to be recovered is a part of and not in addition to the "allowable cut".

In explaining how in thus cutting the entire growth of timber, but no more, in the year in which the "back-log" is to be cut, St. Regis is to get credit for the "back-log" claimed to have arisen during the first fourteen years of the contract (in view of the fact that the contract provides in Paragraph 11 that St. Regis must pay the owners for the entire growth in that year), it is said that this is done simply by paying to the owners in that year the minimum $40,000.00 payment and after determining the amount of cords that $40,000.00 would buy under the applicable price fixed by Paragraph 2 the balance of the growth so cut would be credited to back-log.

The Court cannot accept this construction of the contract for the simple reason that the contract *does not say this* either expressly or inferentially. This may have been what the parties intend-

ed, but this is materially different from what the parties said, and the general rule, which is applicable here, is that the parties are bound by the plain language used in the agreement. Lion Oil Co. v. Gulf Oil Corp. (CCA 5th), 181 F.2d 731; Delong v. Cobb, 215 Ga. 500, 111 S.E.2d 89; Malsby & Avery v. Young, 104 Ga. 205(5), 30 S.E. 854; National Bank of Monroe v. Wright, 77 Ga.App. 272, 276, 48 S.E.2d 306.

If we should arbitrarily substitute for the words "as the purchase price of the timber authorized to be cut" (as found in the payment provisions of Paragraph 8B) the words "as the purchase price of the timber set forth in the schedule", so that this provision would read that St. Regis was to pay to the owners "as the purchase price of the timber set forth in the schedule during the year such payments are due, a sum equal to one-fourth of the purchase price of the quantity of wood growth above set forth in the schedule of this Paragraph 8B for such year", then it would necessarily and logically follow that as to the difference between the growth (all of which St. Regis cut) and the scheduled amount of timber (the "back-log" claimed by St. Regis), St. Regis could not possibly cut such difference in a subsequent year after having first cut the allowable cut or growth for that year without being in clear violation of the provision prohibiting the cut of more than the average growth of the timber. On the other hand, if St. Regis, in a subsequent year, cut only the growth, in order not to violate the proscription in Paragraph 7 against cutting more than the average annual growth, then since St. Regis is required in Paragraph 11 to pay for the growth so cut at the then prevailing price as determined under Paragraph 3 it would, follow that St. Regis would not be able to get credit for the "back-log".

The language of the agreement clearly states that a "back-log" cannot be cut "*until*" St. Regis has cut the "allowable cut" or the growth for that year and also that St. Regis must pay for such growth in that year. The construction given to the contract by counsel for St. Regis would in the Court's view, materially change these requirements.

Moreover, the suggested method of payment of the purchase price for the current timber growth in the years after 1966, by payment of $40,000.00 and, after deducting the number of cords this sum would purchase under the then existing price, cutting and crediting the remaining growth for that year as "back-log" in satisfaction of the balance of the purchase price, will not work satisfactorily. In this situation, the parties would be dealing not only with the number of cords of "back-log" but also in dollars and cents credit to cover the purchase price of the current year's growth. In calculating the credit for the excess of the annual growth over the number of cords $40,000.00 would purchase at then prevailing prices, are the parties to use the average amount claimed to have been paid for the "back-log", or is the "back-log" to be recovered in the order it was created and the exact amount paid therefor to be used, or are the parties to use the then existing price?

In any event, it is clear, according to the Court's calculations, that to the extent that the cost (average or actual) is used, and the cost is less than the current prevailing price of timber under Paragraph 2, the amount of timber growth in excess of the cords $40,000.00 minimum payment would purchase, valued at cost, would not be sufficient to cover the balance of the purchase price, and in order to accomplish this, St. Regis would have to cut more than the current growth and under the facts more than the average annual growth for that and previous years.

Insofar as the current purchase price is to be used, and it exceeds the cost of the "back-log", then while the current annual purchase price could be satisfied in the manner claimed, nevertheless, by crediting the amount of cords of timber cut as "back-log" against the total number of cords claimed as a "back-log", and applying the credit against the cost, the cost column would be exhausted before the cord column. If the prevailing price is

less than the cost, then the cord column becomes exhausted before the full cost is recovered.

The contract does not undertake to answer these perplexing questions, which perhaps is still another indication that the claim of counsel for St. Regis as to what constituted a "back-log", and how it is to be recovered, is not sound.

■ The contract, in referring to a "back-log" and its recovery, says nothing about crediting any amount paid during the first fourteen years to the satisfaction of the purchase price which the contract provides is to be thereafter paid on the basis of annual growth. The contract simply provides, in effect, that if during the first fourteen years St. Regis fails to cut *growth which it was entitled to cut*, then it would have the right, in a subsequent year, to cut and pay for the growth in such subsequent year, and *then* cut the "back-log" of uncut growth. In this scheme of things, none of the problems outlined above would arise.

Counsel for St. Regis contend that "The construction placed upon the contract by the Defendants would eliminate the effectiveness of Paragraph (13) and could result in the purchaser paying an amount equal to $3.75 per cord, or more, for 22,615 cords, or more, and being limited to a cut of one (1) cord, which would have the practical effect of making the purchase price of a single cord of pulpwood approximately $91,000.00", and they claim that this sort of construction is unreasonable.

■■ It is true that in the interpretation of contracts a reasonable construction is preferred to that which is unreasonable and that that interpretation should be adopted which, under all of the circumstances of the contract, ascribes the most reasonable, probable, and natural conduct to the parties. 17 Am.Jur.2d Contracts, § 252, page 644; City of Orlando v. Murphy (CCA 5th), 84 F.2d 531; Phillips Petroleum Co. v. Gable (CCA 10th), 128 F.2d 943; Central Georgia Electric Membership Corp. v. Georgia Power Company, 217 Ga. 171, 121 S.E.2d 644. Nevertheless, this rule has express application only where the contract is ambiguous and there is a basis for ascribing different meanings to the language used by the parties; and this rule has no application in this case since, in the Court's view, the agreement is not susceptible to the interpretation given to it by counsel for St. Regis.

It seems clear to the Court from the terms of the contract that St. Regis took whatever calculated risk there may have been in respect to whether the growth would equal the scheduled amount of timber as set out in Paragraph 8B. It is not an unfair assumption that St. Regis is, and was at the time the agreement was entered into, thoroughly knowledgeable with respect to the property and with respect to the growing and harvesting of timber thereon. The contract placed upon St. Regis and not the owners the obligation to exercise good forestry practices and to otherwise properly manage the property in accordance with the contract, and there was a clear agreement by the parties that if St. Regis complied with its obligations in this respect, the property should produce the scheduled amounts of timber during the first fourteen years. Presumably, the owners desired to be assured of payments on the basis of an agreed scheduled amount of timber that would bring them a fixed income during the first fourteen years subject only to such variances as might result from increases or decreases in the Price Index. Apparently St. Regis was willing to agree to this even though the actual growth might be less than the scheduled growth and was willing to pay for the actual growth which it had the right to cut the same amount that it would have paid had the growth equaled the scheduled amount.

Furthermore, the contract as so construed cannot be labeled as being unwise and uneconomical from St. Regis' viewpoint. It is not self-evident that the overall cost of the timber actually cut by St. Regis during the first fourteen years was unreasonable or unprofitable. It is true that there could have been in one of those

years only one cord of growth and as suggested, in such event, St. Regis would have had to pay a very large amount for the single cord of pulpwood which it was authorized to cut under those circumstances. However, the same situation could have resulted from a disastrous fire which could have reduced the authorized cut to zero, but, the contract clearly spells out the proposition that in such event St. Regis would continue to have to make the payments under the contract. Neither a deficiency in growth within itself as compared with the scheduled amount of timber nor fire which could reduce the authorized cut, were contingencies which relieved St. Regis from its obligation with respect to the payments to be made to the owners under the contract.

■■ Counsel for St. Regis also point out that forfeitures are regarded with disfavor and that an interpretation which does not involve a forfeiture is favored. However, no question of forfeiture is here involved. In order for there to be a forfeiture there must be some right or vested interest involved. The contract did not establish any right in St. Regis to cut the timber which it claims a right to cut; and therefore there is no question of forfeiture of such right.

Neither of the cases of Hendrix v. W. R. Altman Lumber Co. (CCA 5th), 145 F.2d 501, or Dyal, Jr. v. Union Bag-Camp Paper Corp. (CCA 5th), 263 F.2d 387, decide anything contrary to the holding of the Court in this case.

The *Hendrix* case involved a sale of all of the timber on a described tract of land and the question there principally adjudicated was whether or not a provision calling for a minimum annual cut of timber served to limit the time that the owner of the timber had to take the timber off of the property.

In the *Dyal* case the timber lease provided that the company was to pay a fixed annual rental, and the company was given the right after the first seven

years and during the first five years thereafter to cut a certain amount of cords of timber from the property each year with the number of cords to be cut in each year thereafter during the term of the lease to be determined by cruises made at five year intervals. The agreement contained a provision similar to that in the present case which prohibited the company from removing timber in excess of the estimated growth of the entire tract. The principal question at issue in this case was whether, if the company did not cut the amount of timber that it was entitled to cut in one year, it could cut it in a subsequent year. The Court pointed out that there was no requirement in the contract that the growth of each calendar year be removed during that year or otherwise be lost, and held that the company could cut it in subsequent years within a reasonable time. There the company did not exercise its full cutting rights in previous years and the timber it was undertaking to cut in a subsequent year it had the right to cut in previous years. This is, of course, not true in the present case. What St. Regis here claims to be a "back-log", accrued in the years from 1959 through 1966, and was not timber that it had the right to cut in each of those years.

It appearing that St. Regis has cut and removed all of the timber which it has paid for, it is not entitled to any refund of the amount paid under a theory of "money had and received" or otherwise.

In view of the foregoing, it is ordered that the Motion for Summary Judgment filed by St. Regis for the grant of the right to cut the difference between the amount cut in the first fourteen years and the scheduled amount as set forth in Paragraph 8B of the agreement; or, in the alternative, that St. Regis be entitled to recover the amount paid therefor, be denied; and that the Motion for Summary Judgment filed by the Defendants asking that such relief be denied, is hereby granted.