Theodor Seuss **GEISEL**, Plaintiff,

v.

**POYNTER PRODUCTS, INC.,** Alabe Crafts, Inc., Linder, Nathan & Heide, Inc., and Liberty Library Corporation, Defendants.

No. 68 Civ. 997.

United States District Court
S. D. New York.

Dec. 10, 1968.

As Amended Dec. 23, 1968.

White & Case, New York City, for plaintiff; William D. Conwell, Laura Banfield, New York City, of counsel.

Cowan, Liebowitz & Latman, New York City, for defendants; Alan Latman, Arthur J. Greenbaum, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

Can an artist who sells his signed cartoon to a magazine validly object to the magazine's making and selling a doll which is truthfully advertised as based upon the cartoon? This, capsulated, poses the critical issue herein.

### The Complaint

Plaintiff, Theodor Seuss Geisel, is the world-famous artist and author, whose nom de plume is "Dr. Seuss." In a complaint against the four defendants, filed March 8, 1968, plaintiff charged that the defendants manufactured and were advertising and selling dolls "derived from" [Complaint, ¶ 21] certain material which plaintiff "prepared for publication" [Complaint, ¶ 17] for the now defunct Liberty Magazine in 1932 and which was published in that magazine from June to December 1932; that, although plaintiff had nothing to do with the design or manufacture of the dolls, they were being advertised and sold as "Dr. Seuss" creations; and that the dolls are "tasteless, unattractive and of an inferior quality" [Complaint, ¶ 41; 23].

On the basis of these and other allegations, plaintiff requested compensatory and punitive damages as well as an injunction enjoining defendants from using the name "Dr. Seuss" in any manner without plaintiff's consent, or in connection with any product not designed or approved by plaintiff.

In support of this prayer for relief, plaintiff pleaded five causes of action: (1) violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1964); (2) unfair competition, including violation of Section 368-d of the New York General Business Law, McKinney's Consol.Laws, c. 20; (3) violation of plaintiff's right of privacy as provided by the New York Civil Rights Law, McKinney's Consol.Laws, c. §§ 50, 51; (4) defamation; and (5) conspiracy with intent to injure plaintiff (prima facie tort).

### The Preliminary Injunction

An order to show cause for a preliminary injunction was signed on March 8, 1968. On March 12, this Court heard argument on that motion, issued a temporary restraining order (which, in substance, restrained defendants from using the name "Dr. Seuss" in any manner in connection with any doll, toy or other product), and granted the parties leave to conduct discovery and to submit further papers.

On April 9, 1968, this Court concluded that there was a reasonable probability of plaintiff's success upon the trial of the Lanham Act (first) cause of action and issued a preliminary injunction restraining defendants as follows:

"The defendants, their officers, agents, servants, employees and all persons acting under their control and

each of them are hereby enjoined and restrained pendente lite from committing any of the following acts in connection with the manufacturing, displaying, advertising, distributing, selling or offering for sale of any doll, toy or other similar product:

A. Representing that defendants' doll, toy or other similar product has been created, designed, produced, approved or authorized by plaintiff;

B. Describing defendants' doll, toy or other similar product as having been created, designed, produced, approved or authorized by plaintiff; or

C. Representing, describing or designating plaintiff as the originator, creator, designer, or producer of defendants' doll, toy or other similar products."

At the same time, the Court advanced the date of the trial on the merits, pursuant to Rule 65(a) (2), Fed.R.Civ.P., to April 22, 1968. (See 283 F.Supp. 261, 268.)

### Defendants' Basic Contentions

It would be useful to summarize defendants' basic contentions, as formulated in the pre-trial order. Defendants claim that they have the right to manufacture and sell the dolls in question for the reason that either (1) defendant Liberty Library Corporation—as successor-assignee of Liberty Magazine—owns complete rights, including copyright, in the cartoons published in 1932, and "the owner of copyright in cartoons has the exclusive right to make three-dimensional figures therefrom," or (2) the cartoons are in the public domain and, therefore, "anyone may use such cartoons as the basis for the three-dimensional figures." Defendants contend that the dolls are specifically "based on" Plaintiff's Exhibits 14A, 14B and 14C.

In addition, defendants argue that they have the right to state truthfully the relationship between plaintiff-cartoonist

and the dolls, including the circumstance that the dolls were "based on, adapted from or inspired by" the plaintiff's Liberty Magazine cartoons. Finally, defendants have urged a variety of other defenses to the causes of action set forth in the complaint [P.T.O. 4 (pp. 13–14)].

This opinion contains the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.[1]

### Certain Undisputed Facts

Certain facts relating to the parties to this suit have been stipulated as not in dispute or are undisputed:

1. Plaintiff, Theodor Seuss Geisel (hereafter Geisel or plaintiff), is a well-known author and illustrator and a resident of La Jolla, California.

2. Defendant, Poynter Products Inc. (hereafter Poynter), is an Ohio corporation having its principal place of business at 7 Arcadia Place, Cincinnati, Ohio; it is engaged in the business of producing and selling toys and novelties. Its president and sole stockholder is Donald B. Poynter.

3. Defendant, Alabe Crafts, Inc. (hereafter Alabe), is an Ohio corporation having its principal place of business at 1632 Gest Street in Cincinnati, Ohio; it distributes, among other things, the products of Poynter Products Inc.

4. Defendant, Liberty Library Corporation (hereafter Liberty), is a New York corporation with its principal place of business at 353 West 57th Street, New York, New York. Its president is Miss Lorraine Lester (Mrs. George Lessner). Its vice-president and treasurer is George Lessner. Its executive administrator is Robert Whiteman. The stock of Liberty is completely owned by Mr. and Mrs. Lessner.

5. Defendant, Linder, Nathan & Heide, Inc. (hereafter Linder), is a New York corporation having its principal place of business at 200 Fifth Avenue,

---

1. The Pre-Trial Order is referred to as P.T.O.——. At the trial, it was stipulated that the trial record shall include as stipulated facts not in dispute the facts set forth in the Pre-Trial Order [1502; P.T.O.2(p.1)]. These facts are referred to as P.T.O.Stip.——.

New York, New York. It is engaged in selling toys and novelties to retailers; it acts as manufacturers' representative in New York City for defendant Alabe and others.

There is diversity of citizenship between the parties. The matter in controversy, exclusive of interest and costs, exceeds the sum of $10,000. It is not, therefore, necessary to decide whether there is an independent basis of jurisdiction.

*The 1932 Agreement*

At the trial, a substantial amount of the evidence concerned the nature of the 1932 agreement between plaintiff and Liberty Publishing Corporation (hereafter Liberty Magazine). Plaintiff contends that the evidence proves that plaintiff assigned to Liberty Magazine the title to the cartoons with their accompanying text

"* * * with the understanding that Liberty would copyright this work as part of the entire issue of the magazines in which they appeared. It was understood, however, that while Liberty had the complete rights to publish these works in one issue of Liberty Magazine, Liberty held all other rights to this work (including the right to renew the copyright and the right to make other uses of the work) in trust for plaintiff." [P.T.O. 3 (p. 12)].

Plaintiff presents this contention as an additional reason why he is entitled to the relief prayed for in the complaint.

On the other hand, defendants contend that the 1932 agreement provided for the transfer to Liberty Magazine of all or complete rights in the cartoons and accompanying text without reservation of any rights in plaintiff.

Certain facts relating to the 1932 transaction have been stipulated as not in dispute. The parties agree that, in 1932, plaintiff "* * * prepared and sold to Liberty Magazine material which was published in weekly issues of Liberty Magazine during the months of June through December 1932" (P.T.O.

Stip. 22); that the material consisted of a series of twenty-three "cartoon essays" and that "each work [consisted of a page which] contained at least three cartoons and each cartoon contained several animal creations" (P.T.O.Stip. 23, 25); that the material appeared in Liberty Magazine under the following titles: "Goofy Olympics," "Some Recent Developments in Zoology," "A Few Notes on Birds," "A Few Notes on the Coming Elections," "A New Idea in Taxation," "The Summer Problem and How to Solve Them," "A Few Notes on Torture," "Some Recent Inventions in the Offspring Field," "Educational Projects," "A Few Bright Spots on the Business Horizon," "Three Glorious Movements in the Clothing Field," "A Few Notes on Games," "The Rough Road to International Harmony," "House Cleaning the English Language," "A Few Hints on Hypnotism," "Some New Aids to Better Living," "A Few Notes on Origins," "A Few Notes on Fires," "A Few Hints on Navigation," "Is the Bird in Hand Really Worth Two in the Bush, Part I," "Is the Bird in Hand Really Worth Two in the Bush, Part II," "A Few Notes on Facial Foliage," "A Few Notes on Sleep." (P.T.O.Stip. 24); and that plaintiff received $300 for each work (P.T.O.Stip. 25). (Photostatic copies of the pages of Liberty Magazine upon which the "cartoon essays" appeared were admitted into evidence as Pltf. Exhibits 14A–W.)

There is also no dispute that the issues of Liberty Magazine in which the cartoons appeared were copyrighted by Liberty Magazine as entire issues (P.T.O.Stip. 23). Each issue contained the required notice of copyright; and Certificates of Copyright Registration were secured by Liberty Magazine (P.T.O.Stip. 23; Deft.Ex. 4). It is also agreed that "[n]o separate copyright was obtained * * *" by the plaintiff upon the cartoons (P.T.O.Stip. 23).

The only evidence describing the negotiations and consummation of the agreement between plaintiff and Liberty Magazine in 1932 was the testimony of

plaintiff himself and of Leland Hayward. Hayward, presently a theatrical producer, was a literary agent from about 1929 to 1943 [Hayward, 484–485].[2] According to plaintiff's and Hayward's testimony, one Ben Wasson approached plaintiff and asked whether he could represent him in seeking to place his work in magazines. Plaintiff agreed. [Geisel, 992–993]. Prior to this conversation, in the 1920's and early 1930's plaintiff had sold other drawings to a number of magazines, including Judge, Vanity Fair, and the Saturday Evening Post [Geisel, 910]. During this period, plaintiff also drew cartoons for the Standard Oil Company of New Jersey to advertise a product known as "Flit." The "Quick, Henry the Flit" series appeared in magazines [Geisel, 911–912], including Liberty Magazine [Deft.Ex. 21].

Ben Wasson, who did not appear as a witness, represented plaintiff in the negotiations with Liberty Magazine [Geisel, 1464; Hayward, 501]. In so doing, Wasson acted as an employee of the Leland Hayward Agency. [Geisel, 942–943, 995; Hayward, 501]. Although Hayward did not personally handle the transaction, he recalls that he had one conversation with Fulton Oursler, then editor-in-chief of Liberty Magazine. Oursler stated that plaintiff was "popular" and that his work was "very suitable" for Liberty Magazine [Hayward, 507]. Hayward could not remember anything else said at that or any other time relating to the negotiations [494–495; 507]. To the best of his recollection, there was no formal written contract executed in connection with this transaction [490].

Plaintiff's only contact in 1932 with Liberty Magazine was a meeting of about fifteen minutes' duration with Fulton Oursler [Geisel, 1463]. However, all that plaintiff recalls of that occasion is that Oursler said " * * * 'Glad to have you aboard,' or something like that" [1463]. Prior to that meeting, Wasson had told plaintiff of a "firm commit-ment" for plaintiff " * * * to do a number of pages, a small number of pages, because everything was sort of on a try-out basis * * * to see if they worked. I don't know how many pages they said they would buy, but they were $300 a piece" [Geisel, 1464–1465]. From this and other evidence [Geisel, 1466], the Court infers that the works which plaintiff sold to Liberty Magazine were not in existence at the time the contract was entered into; instead, they were created at Liberty Magazine's request.

The $300 payments were made by check to the Leland Hayward Agency, which deducted its commission as agent and then remitted the balance to plaintiff [Geisel, 1001; Hayward, 497–501].

Nothing was expressly said by either side during the negotiations regarding the scope of rights that Liberty Magazine obtained by the purchase of the material [Geisel, 1062]. Plaintiff denies that the words "all rights" or "complete rights" were used by either side during the negotiations [1039–1040].

This evidence demonstrates that plaintiff agreed to prepare cartoons for publication in Liberty Magazine; that the cartoons were published; that plaintiff received $300 a page; that the only copyright upon this material was in the name of Liberty Publishing Company; and that plaintiff did not *expressly* reserve any rights in the cartoons.

There is evidence, and the Court so finds, that, with certain exceptions which do not apply in this case, the custom and usage in 1932 in the magazine trade were that an agreement for the sale of a work between authors or their agents and magazines was oral and not a formal written contract [Hayward, 486, 515–516; Geisel, 1028, 1036; Norton, 1357–1358; Wasserstrom, 1315]. The agreement was usually reached after *only* monetary terms were discussed [Hayward, 486, 515–516]. This contrasts with the custom in the book publishing field in which similar contracts

---

2. Unless otherwise specified, references are to the trial record.

were written [Geisel, 1028; Hayward, 531; Cerf, 569, 588].[3]

 If, arguendo, all rights in the cartoons were not assigned to Liberty Magazine in 1932, Liberty's copyright upon the entire issues of the magazine does not cover the cartoons. Mail & Express Co. v. Life Pub. Co., 192 F. 899, 900 (2nd Cir. 1912); Goodis v. United Artists Television, Inc., 278 F.Supp. 122, 125 (S.D.N.Y.1968) (novel published in magazine pursuant to agreement for one-time serialization rights *before* it was separately copyrighted and published in book form); Kaplan v. Fox Film Corporation, 19 F.Supp. 780, 781 (S.D.N.Y. 1937). It would then follow that the cartoons would be in the public domain because admittedly they were *published* in 1932 without a separate copyright. Goodis v. United Artists Television, Inc., supra. This result would transpire for the reason that a work can be copyrighted only by its "author or proprietor" (17 U.S.C. § 9); the "proprietor" can be the assignee but not the licensee of the right to use the work; and to be the assignee of the work, one must have been assigned all rights in the work. Cf. Hirshon v. United Artists Corporation, 100 U.S. App.D.C. 217, 243 F.2d 640, 643 (1957) (doctrine of copyright indivisibility); Kaplan v. Fox Film Corporation, supra.

 Consequently, if the cartoons are not to be deemed in the public domain, it must be shown that all rights in the cartoons were assigned to Liberty Magazine in 1932. To escape from this logical dilemma plaintiff argues that, although legal title to the copyright was in Liberty Magazine's name as assignee-"proprietor", the copyright was held in trust for the cartoon's true or equitable owner, plaintiff. *See* Bisel v. Ladner, 1 F.2d 436 (3rd Cir. 1924) (legal and equitable title to a copyright may be in different persons); Brennan v. Paramount Pictures Corporation, 209 F.Supp. 150, 151 (S.D.N.Y.1962) (issue of fact precludes summary judgment); Manning v. Miller Music Corporation, 174 F.Supp. 192, 195 (S.D.N.Y.1959); Cohan v. Richmond, 19 F.Supp. 771, 773 (S.D.N.Y.1937) (alleged trust beneficiary must prove that successors to record owner had notice of "equitable lien"). Plaintiff, therefore, asks for judgment declaring that the defendants hold the copyright in trust for plaintiff and ordering that the copyright be assigned to plaintiff.[4]

 Whether this trust relationship exists is primarily a question of fact dependent upon the circumstances of the case. *See* Bisel v. Ladner, supra; Brennan v. Paramount Pictures Corporation, supra.

In this case, there was no *express* agreement that Liberty Magazine would hold the copyright in trust for plaintiff or that plaintiff reserved any rights in the cartoons. However, much evidence was offered by both sides with respect to the issue whether there was any settled and established custom and usage in the magazine publishing trade in 1932 by which any terms or conditions were implied in fact or understood to be part of a contract between an author or his agent and a weekly magazine; and if so, what were those implied-in-fact terms.

Evidence was also offered with respect to the issue whether there was any settled and established custom and usage

3. The legal problems presented by the custom of oral agreements covering magazine contributions are described in Caterini, Contributions to Periodicals, 10 ASCAP Copyright Law Symposium 321 (1959); and Wasserstrom, *The Copyrighting of Contributions to Composite Works; Some Attendant Problems*, 31 Notre Dame Lawyer 381 (1956).

4. There can be no doubt that the "proprietor" of a copyright upon the entire contents of a magazine may validly assign the copyright upon a single picture or article in that magazine. See 17 U.S.C. § 3 (1964) (copyright upon a periodical is copyright upon all "component parts" of the periodical as if each part were individually copyrighted); Mail & Express Co. v. Life Pub. Co., 192 F. 899, 900 (2nd Cir.1912); Kaplan v. Fox Film Corporation, 19 F.Supp. 780, 781–782 (S.D.N.Y. 1937) (such an assignment would not violate the indivisible copyright doctrine).

concerning what the magazine was impliedly agreeing to in fact with respect to the extent of the magazine's use of the purchased material; and concerning the alleged practice of a magazine to hold its copyright in trust for the author and to reassign its copyright upon the request of the author.

Section 209 of the Copyright Law, 17 U.S.C. § 209 (1964), provides in relevant part that the certificate of copyright registration " * * * shall be admitted in any court as prima facie evidence of the facts stated therein." *See* Rohauer v. Friedman, 306 F.2d 933, 935, 2 A.L.R.3d 1395 (9th Cir. 1962); Wihtol v. Wells, 231 F.2d 550, 553 (7th Cir. 1956) (validity of copyright); Hedeman Products Corp. v. Tap-Rite Products Corp., 228 F. Supp. 630, 633 (D.N.J.1964) (title and validity); Edward B. Marks Music Corp. v. Borst Music Pub. Co., 110 F.Supp. 913, 917 (D.N.J. 1953) (title). Hence, at least prima facie, Liberty Magazine owned the copyright in 1932 [Deft.Ex. 4] and defendant Liberty Library Corporation presently owns the renewed copyright [Deft.Ex. 3; Pltf.Ex. 12] without reservation.

Plaintiff offered the testimony of three witnesses with respect to the above-mentioned customs and usages in 1932 in the magazine publishing trade: Bennett Cerf, Leland Hayward and plaintiff himself.

Mr. Cerf has been a *book* publisher since 1925 and has himself written books as well as articles for periodicals [Cerf, 275–276, 606]. Plaintiff's books are published by the firm of which Cerf is chairman of the board [Cerf, 275; P.T.O. Stip. 33]; and, in fact, plaintiff is the president of a division of that firm [Geisel, 920; P.T.O. Stip. 34]. Mr. Cerf is an eminent personality in the field of *book* publishing. However, his testimony with respect to customs and usages in the *magazine* trade is found by the Court to be tenuous and unpersuasive. He repeatedly admitted his unfamiliarity with magazine customs [Cerf, 291, 295, 304] and with contracts between magazines and authors or their agents [Cerf, 588]. Furthermore, some of his testimony presents internal inconsistencies and self-contradictions [*see* Cerf, 282, 297, 303 and 570; 296, 306 and 282, 283; 317 and 586].

Three witnesses called by defendants testified about the relevant customs and usages: Meyer Dworkin, Alfred Wasserstrom and Alden Norton. Mr. Dworkin, a retired attorney and accountant, was an adviser or "righthand man" to the head of Macfadden Publications, a magazine publisher, which purchased Liberty Magazine in 1931. Dworkin was associated with Macfadden Publications from 1919 until 1961 [Dworkin, 405–407, 412, 417].

Alfred Wasserstrom, an attorney specializing in copyright and trademark law, is connected with the Hearst Corporation Legal Department. He has been with the Hearst Corporation since December 1933, when he was admitted to the bar. He has guest-lectured at law schools; is a member of the board of trustees of the Copyright Society of the U. S. A.; and is a member and chairman of the Copyright Committee of the Magazine Publishers Association [Wasserstrom, 1306–1308].

Alden Norton, advisory editor of Argosy Magazine, is in charge of its foreign sales and rights and subsidiary rights. In 1932, he began working as an editor for Frank A. Munsey Company, a magazine publisher, and remained there until 1935, when he left to join Popular Publications, publisher of Argosy [Norton, 1355–1356, 1369–1370]. While an editor in the 1930's, Norton dealt with authors and their agents with respect to literary purchases [1357, 1370]. He has also sold numerous stories and novels of his own to magazines since 1929 [1355, 1357].

On the basis of the great weight of the credible evidence, the Court finds that during the relevant period it was the custom and usage in the magazine trade for the magazine to obtain a copyright upon the entire contents of the magazine [Hayward, 487, 492; Dworkin, 475;

Wasserstrom, 1389]. However, the author or artist *could* also obtain a separate copyright upon his particular work, as plaintiff did with respect to a "Quick, Henry the Flit" cartoon-advertisement which appeared in Liberty Magazine in 1931 [Deft.Ex. 21; P.T.O.Stip. 26; Geisel, 940–942, 945].

Virtually all the testimony was in agreement on the proposition, which the Court finds established, that there was a settled custom and usage in the magazine publishing trade in the early 1930's by which a term or condition defining the scope of rights was implied in fact or understood to be part of the agreement between the author or his agent and the magazine [Hayward, 488; Geisel, 915–917; Dworkin, 476–477; Norton, 1062, 1063–1064]. What that term or condition provided is a subject, however, about which the testimony is sharply conflicting.

Mr. Cerf testified that, if nothing was said with respect to the scope of rights purchased, the term "always" implied in the agreement provided for the sale of "one-shot publication"—publication in one issue of the magazine—and return of the copyright thereafter upon the request of the author [Cerf, 299–300, 578, 619]. He stated that the term "all rights" meant this understanding [316].

Mr. Cerf indicated that the basis of his knowledge of this custom or understanding was the "minimal" amount paid to plaintiff for the cartoons [Cerf, 300, 307]. He also testified that, if an author-artist received anything less than $1,000 a page in 1932 for his work, it meant that only one-time magazine rights were sold [Cerf, 310–311].

Although the price paid may be a circumstance probative of the scope of rights purchased by Liberty Magazine in 1932 [*see* Norton, 1362–1363], the clear preponderance of the credible evidence demonstrates that the price of $300 per page in 1932 was a " * * * reasonable price for that particular year" in view of

the near "panic" caused by the depression [Hayward, 517; Norton, 1368].

Mr. Hayward testified that the "standard practice" or usage in the magazine trade in 1932 " * * * was [for the material] to appear in one issue of the magazine or, in the case of a serialization, in several issues * * * " [486–487, 488]. The magazine was limited in its use of the material to single or serial publication " * * * and those rights are called 'complete rights'—or were" [Hayward, 508, 509–509a]. He, and other witnesses, stated that the expressions "all rights" and "complete rights" had the same meaning [Hayward, 530, 546; Norton, 1363; Wasserstrom, 1374–1375]. But, Mr. Hayward repeatedly stated that "all rights" did not mean "all" and that "complete rights" did not mean "complete" [546]; rather, that these terms had a limited meaning [510]. According to Mr. Hayward, "complete rights" in the magazine trade meant " * * * the complete right to publish that particular piece of material in a single issue * * * or, in the case of serial rights, to publish parts of the material in several or more issues * * * " [533–534]. Mr. Hayward also testified that, although the term "all rights" was not expressly used in negotiations, it was *"implicit" in the agreement* [510].

Mr. Hayward further asserted that, after publication, the custom provided that the magazine " * * * would *always* assign the copyright to anyone the author requested" (emphasis added). The magazine was thus the "custodian of the copyright" [492]. He added that he had *never* heard of a magazine sharing the revenues gained on the material after the assignment back [547–548].

Plaintiff also testified that, in 1932, custom or usage implied in fact in the agreement a condition that the magazine would use the purchased material only in a single insertion in the United States and Canada [Geisel, 915, 917, 1035, 1037–1039].[5]

---

5. The Court finds unconvincing plaintiff's testimonial assertions that there was a

custom or usage in 1932 which *implied in fact* in the agreement a condition that

If believed in its entirety, the evidence adduced in behalf of plaintiff would prove that in 1932 custom or usage in the magazine trade implied in fact in the Geisel-Liberty Magazine agreement that (a) each cartoon could be used only in a single insertion in the magazine; that (b) thereafter the copyright was held in trust for plaintiff and would be reassigned to him at his request; and that (c) the term "all rights" or "complete rights," which was understood to mean (a) and/or (b), was "implicit" in the agreement.

Meyer Dworkin, called as a witness for defendants, testified that he did not recall, and, in fact, there "categorically" never was, any custom or understanding in 1932 whereby an author " * * * would reserve impliedly all rights except the right to have the magazine publish in that issue the particular work of art" [Dworkin, 449–450, 451]. On the contrary, the custom was that "where the author said nothing and sold the manuscript to the company, the company would receive all rights * * * " [Dworkin, 452]. He stated that this custom was understood by Liberty Magazine, Mcfadden Publications *and by the authors* who dealt with them [476–477]. Mr. Dworkin defined "complete rights" as "all rights, full rights" [445] with no residual rights in anyone else [446].

Although Mr. Dworkin admitted that Liberty Magazine (or Macfadden Publi-

cations) occasionally would reassign its rights to an author without charge, he stated that at other times the reassignment would be for a fee or for a share of the author's profits after the assignment back. Whether reassignment would be made and whether it would be made without payment depended upon who the author was and the purpose for which the assignment back was sought [Dworkin, 465, 468–469]. Mr. Dworkin explained that sometimes reassignment would be made to retain the author's friendship and goodwill [451, 464].

Alden Norton convincingly testified that, although every story purchased by a magazine was individually bargained for, " * * * if you sold me a story and you didn't ask for anything, you sold me all rights and it would say so on the check" [1362]. He also testified that, if there were no written or oral agreement and no legend on the check and the author or artist simply delivered the work to a magazine and was paid $300 a page, the custom and usage in 1932 provided that "[u]nless otherwise specified, [the author granted] all rights" [1363–1364, 1368]. Mr. Norton rejected the assertion that, if nothing was said, only first publication rights were acquired by the magazine [1367–1368]. He testified that, if all rights were not acquired, there were specific negotiations—i. e., something *was said* [1368]—and a lower price would be paid for the material [1362–1363].

the magazine would not alter or change a drawing; and that it was unheard of for a magazine publisher to tamper with *a single word* of a story or *a single line* of a drawing without the author's consent [Geisel, 1065–1066]. This rejection of plaintiff's testimony does not suggest that such rights cannot be provided for, either expressly or impliedly, in a contract. The Court holds only that no such contractual provision was implied in fact in the Geisel-Liberty Magazine agreement.

The doctrine of "moral right" recognized by the civil law of many European and Latin American countries encompasses the right of an author or artist " * * to object to any distortion, mutilation or alteration * * * " of his work even

after the transfer of the copyright in his work. Berne Convention, article 6 bis [printed in Howell's Copyright Law 307, 310 (rev. Latman ed. 1962)]. See Roeder, *The Doctrine of Moral Right*, 53 Harv.L.Rev. 554 (1940); 2 Lindey, Entertainment Publishing and the Arts: Agreements and the Law 1047 (1963); Cahn, The Moral Decision 197 (1955). However, the doctrine of moral right is not part of the law in the United States, see Vargas v. Esquire, Inc., 164 F.2d 522, 526 (7th Cir. 1947); Shostakovich v. Twentieth Century-Fox Film Corp., 196 Misc. 67, 80 N.Y.S.2d 575, 578–579 (Sup.Ct. 1948), except insofar as parts of that doctrine exist in our law as specific rights—such as copyright, libel, privacy and unfair competition.

Mr. Norton's testimony indicates that the words "all rights" were a recognized term in the magazine trade in 1932. But he rejected plaintiff's contention that custom or usage gave these words a specialized meaning [1360–1362]. As he said, "all rights" meant literally all rights [1361]—i. e., " * * * dramatic, movie, television, skywriting on Mars, anything you want to say * * * everything" [1360, 1361–1362]. He also said that where "all rights" were purchased, the author " * * * retained absolutely nothing" [1362].

Alfred Wasserstrom also testified persuasively that he knew of no custom or usage which gave the words "all rights" a specialized meaning in the magazine trade in 1935 [1327–1328, 1372].[6] He agreed that the words "all rights" had a plain, colloquial English meaning [1372–1374, 1375]. Likewise, he testified that he knew of no custom or usage giving the words "complete rights" " * * * any meaning different from their ordinary, accepted English meaning" [1375].

Mr. Wasserstrom stated that there was no implied in fact term or condition, according to the custom or usage in 1935 in the magazine trade, that a magazine could use material (such as Pltf.Ex. 14A–B–C) only for one insertion in the magazine [1376–1377].

Finally, he testified as to the alleged custom which implied a term in agreements between authors and magazines relating to reassignment of the copyright at the request of the author. He stated that such a custom existed in 1935 "[i]f only limited rights were acquired * * *" (emphasis added) [1382]. Thus, it was customary that, where the magazine purchased limited or restricted rights, such as serial rights, the copyright taken out by the magazine would be reconveyed to the author at his request [Wasserstrom,

1382–1383]. When such a reassignment of the copyright was made, the custom recognized that the magazine retained the limited rights (i. e. serial rights) originally acquired by the magazine [1384–1385, 1386, 1392–1393; Deft. Ex. 79–80]. However, Mr. Wasserstrom stressed the fact that *no such custom,* whereby the magazine impliedly agreed to reassign the copyright at the author's request, *existed where all or complete rights were purchased by the magazine; or where nothing was said as to rights* [1383, 1394]. He agreed, on cross examination, that where limited rights were acquired, the author impliedly gave authority to the magazine to secure a copyright on the material as part of the copyright on the entire issue which " * * * would then be held for the benefit of both parties to the extent of their respective interests" [1389].

On the basis of the clear preponderance of the credible evidence, the Court finds that the custom and usage in 1932 in the magazine trade implied in fact in the Geisel-Liberty Magazine agreement a provision whereby all rights or complete rights were assigned to Liberty Magazine [Hayward, 510; Dworkin, 452; Norton, 1363–1364, 1368; Wasserstrom, 1383].

In ordinary acceptance, the expressions "all rights" or "complete rights" have a nontechnical and literal meaning. Plaintiff has failed to sustain the burden of proof which is upon him when he seeks to impart to these words a connotation that is diametrically opposite to their plain, colloquial sense. Cf. S. E. C. v. Sterling Precision Corp., 393 F.2d 214, 218 (2nd Cir. 1968); Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994–995 (S.D.N.Y.1968); St. Regis Paper Co. v. Aultman, 280 F. Supp. 500, 505 (M.D.Ga.1967). The

---

6. The Court stated, at the trial, that it was interested only in testimony regarding custom or usage in the magazine trade between the years 1928 to 1935 [1332, 1337]. Mr. Wasserstrom's qualification to testify as an expert with respect to custom or usage in the magazine trade during that relevant period is clear beyond cavil. He has "occupational experience" (from at least 1934 to the present) as well as "systematic training" in the subject of his testimony. See 2 J. Wigmore, Evidence §§ 555–556 (3d ed. 1940).

Court finds the testimonial assertions of plaintiff's witnesses, in this respect, to be incredible and factitious. The terms "all rights" and "complete rights," when understood according to their plain meaning, signify a totality of rights, including the right of reproduction or common law copyright and the right to secure statutory copyright without qualification.

Stated otherwise, the Court finds, on the basis of the overwhelming preponderance of the credible evidence, that there was no custom or usage which implied in fact in the agreement in issue that Liberty Magazine was restricted, in any way, as to the uses to which the cartoons might be put. The Court rejects the simplistic and unconvincing testimony of plaintiff's witnesses concerning a custom whereby the copyright in this case was being held in trust for plaintiff. Instead, the Court adopts the testimony of defendants' two disinterested expert witnesses, Alden Norton and Alfred Wasserstrom, as to the custom and usage in the magazine trade during the period in' question. The Court finds both Norton and Wasserstrom, and their testimony, to be credible, reliable and persuasive.

▪ Although corroboration for defendants' position—that all or complete rights were purchased by Liberty Magazine in 1932—is not necessary, corroboration is provided by Liberty's "permanent purchase record cards." Some of these cards were introduced into evidence by defendants [e. g. Deft.Ex. 39–47]. Each card specifies, among other things, the author's name, the title, the price paid, the date of purchase and date of publication, the "character" of the material (e. g. article, cartoon, etc.) and the rights purchased. There is a separate card corresponding to each page of plaintiff's cartoons which appeared in Liberty Magazine [Deft.Ex. 46].[7] Each of these cards relating to the Geisel-Liberty transaction expressly states that "complete" rights were purchased.

The Court finds and concludes that these cards are admissible under the Federal Business Records Act, 28 U.S.C. § 1732 (1964)[8] because manifestly they were made in regular course of Liberty Magazine's business and it was the regular course of such business to make such cards and the entries thereon. Meyer Dworkin testified extensively as to the regularity of these business practices at Liberty Magazine. The Court finds his detailed testimony regarding Liberty's practices to be credible and reliable [see, e. g., Dworkin, 408–411, 414–416, 425, 429, 434–435, 477–478].[9] It may be, in

7. Although defendants introduced photostats of the permanent purchase record cards [Deft.Ex. 46], they have satisfactorily explained that the originals were lost in the course of this litigation [Whiteman, 1397–1400, 1403–1404, 1406; Lester, 1251–1256, 1305]. The Court finds that the photostats are true copies of the lost cards.

8. 28 U.S.C. § 1732(a) (1964) provides:
"§ 1732. *Record made in regular course of business; photographic copies*
 (a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business,

and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
 All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.
 The term 'business', as used in this section, includes business, profession, occupation, and calling of every kind."

9. The supposed fact that the cards contain double hearsay because the clerk who made the entries on the cards was without personal knowledge of the rights purchased "shall not affect its [the cards'] admissibility" but "may be shown to affect its [the cards'] weight." 28

fact, that these cards are a customary form of record utilized by magazines in 1932. Alden Norton testified that the same type of records was maintained and used by Frank A. Munsey Company, a magazine publisher, in 1932 [Norton, 1365–1368; Deft.Ex. 87–90 are examples of such cards].

Dworkin also testified that the same recital of rights which appeared on Liberty Magazine's cards was rubber-stamped as a legend on the check sent to the author or his agent [Dworkin, 479–482]. Although no cancelled check relating to this transaction was introduced into evidence, other checks of Liberty Magazine were [e. g. Deft.Ex. 48–50]; and the legends on those checks correspond to the description on the cards of the rights purchased [Deft.Ex. 42–44].

Although oral agreements between authors or their agents and magazines were customary, the Court finds that it was also a custom or usage in 1932 that the scope of rights purchased by the magazine would be set forth in a legend on the check sent to the author or his agent [Norton, 1357–1359; Dworkin, 446, 478–479; Wasserstrom, 1316, 1318–1319, 1320–1321; Cerf, 566]. As Mr. Wasserstrom testified:

"* * * in '34, and for that matter, continuing to the present. There has been a reluctance to write out, say out, spell out at length the legal relationship as far as the acquisition of literary or artistic material is concerned and to merely memorialize it in somewhat eliptical fashion by a legend on a check, on the face of the check or on the back of the check or on the detachable voucher that accompanies a check." [1316].

Although plaintiff [Geisel, 1067–1068] and his agent in 1932, Leland Hayward [512], stated they were unfamiliar with this practice, Norton testified that Frank A. Munsey and Popular Publications and, in fact, other magazine publishers to which he sold articles as an author, had such an established practice [1358–1359]. Wasserstrom testified that Hearst Corporation, which published several magazines, as well as other magazine publishers with which he was familiar, had such a practice [1318–1321]; and Dworkin testified extensively to the same practice at Macfadden Publications, publisher of Liberty Magazine [446, 478–479].[10]

The permanent purchase record cards also circumstantially support defendants' position that complete rights or all rights had their literal meaning. Some of the cards indicated "complete" rights [e. g. Deft.Ex. 39, 46, 69–71]; another "complete, except book" [Deft.Ex. 77]; others stated first and second North American serial rights [e. g. Deft.Ex. 40–41, 47, 81–82]; and some included broadcast rights [e. g. Deft.Ex. 41, 47, 81–82] together with serial rights.

Defendants have also introduced other circumstantial evidence [e. g. Whiteman, 1411–1412; Deft.Ex. 1, 51] which tends to negate the testimonial assertions of plaintiff's witnesses that magazines "never" asked for, received or used rights to material for other than one-shot or serial publication in the magazine.

The ineluctable conclusion is that, when Liberty Magazine bought the cartoons in question from plaintiff, it purchased all rights, including the common law copyright and the right to secure statutory copyright without reservation of any rights in plaintiff.

U.S.C. § 1732(a) (1964). See United States v. Re, 336 F.2d 306, 311–314 (2nd Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964).

10. There is evidence that the same practice continues today [Wasserstrom, 1316; Dworkin, 412]. Forms of such legends suggested for use are set forth in 2 Lindey, Entertainment Publishing and the Arts: Agreements and the Law 776–777 (1963) [one form of legend "* * * to be rubber-stamped on back of remittance check" provides for the "GRANT OF *ALL RIGHTS*" and the other "GRANT OF *FIRST-TIME MAGAZINE RIGHTS*" (emphasis added)].

█ Absent a reservation of the common law copyright or other rights, the copyright and all other rights pass with an absolute and unconditional sale. See Pushman v. New York Graphic Society, 287 N.Y. 302, 307–308, 39 N.E.2d 249 (1942) (painting);[11] Dam v. Kirk La Shelle Co., 175 F. 902, 904 (2nd Cir. 1910) (magazine story); Best Medium Publishing Co. v. National Insider, 259 F.Supp. 433, 434, 439 (N.D.Ill.1966), aff'd, 385 F.2d 384, 386 (7th Cir. 1967), cert. denied, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968) (story in weekly newspaper); Alexander v. Irving Trust Company, 132 F.Supp. 364, 369 (S.D.N.Y. 1955), aff'd, 228 F.2d 221 (2nd Cir. 1955), cert. denied, 350 U.S. 996, 76 S.Ct. 545, 100 L.Ed. 860 (1956) (article in professional journal); Grant v. Kellogg Co., 58 F.Supp. 48, 51 (S.D.N.Y. 1944), aff'd, 154 F.2d 59 (2nd Cir. 1946) (drawings); Nimmer, Copyright, § 125.-12 at 540–541 (1964). Cf. Vargas v. Esquire, Inc., 164 F.2d 522, 526 (7th Cir. 1947) (drawings).

The parties formulate differently the rule of law deducible from the foregoing decisions,—the difference revolving around the point whether an implied reservation of rights may be as effective as an express reservation in precluding the transfer of all of the artist's rights. Regardless of the formulation, the evidence in the present case convincingly establishes only one conclusion: all rights (including the common law copyright) in the cartoons were transferred to Liberty without any equitable or other rights reserved to plaintiff. Liberty's statutory copyright likewise is not subject to any equitable or other rights in plaintiff.

Although there is evidence in the record that plaintiff prepared the cartoons for Liberty *after* an agreement had been reached between his agent and the magazine, the Court does not rely on the cases relating to commissioned works of art. See Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965) (illustrations in trade catalog— " * * * when one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, * * * the presumption arises that * * * the title to the copyright * * * " shall be in the person commissioning the work); Yardley v. Houghton Mifflin Co., 108 F.2d 28, 31 (2nd Cir. 1939), cert. denied, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940) (mural for public building); Lumiere v. Pathé Exchange, Inc., 275 F. 428 (2nd Cir. 1921) (photograph); Grant v. Kellogg Co., supra, 58 F.Supp. at 54 (drawing of "Snap, Crackle and Pop"); Dielman v. White, 102 F. 892, 894 (D.Mass.1900) (mosaic for public building). Cf. Avedon v. Exstein, 141 F.Supp. 278, 280 (S.D.N.Y.1956) (evidence of contrary custom not admissible).[12]

---

11. By statute effective September 1, 1966, the common law copyright in New York does not pass with the sale of the object or material *unless expressly so provided in a written instrument*. See Article 12–E of the New York General Business Law §§ 223, 224. (Emphasis added.) For legislative history, see L.1966, ch. 668, § 1.

12. In view of the Court's findings and holding, it is not necessary to reach the question whether Section 30 of the Copyright Law, 17 U.S.C. § 30, protects defendants, as bona fide purchasers of the copyrights in plaintiff's works, from plaintiff's alleged unrecorded equitable interest in the copyrights. See Brady v. Reliance Motion Picture Corp., 229 F. 137 (2nd Cir. 1916) (author failed to secure reassignment of rights other than serial rights from magazine; magazine then assigned motion picture rights to third parties; third parties protected by recordation statute even though no assignment executed); Brady v. Reliance Motion Picture Corp., 232 F. 259, 261–262 (S.D.N.Y.1916) (subsequent purchasers not protected by statute if actually knew of equitable rights in author or if charged with knowledge because of existing facts within their knowledge); Caterini, Contributions to Periodicals, 10 ASCAP Copyright Law Symposium 321, 349 (1959).

There are other indications in the cases that the contractual right to an assignment cannot defeat a subsequent

*The Dolls*

Having decided that Liberty Magazine acquired *all* rights to the cartoons published in 1932, the Court now considers and determines what rights defendants have to make the dolls [Pltf.Ex. 20A–B, 21A–B, 22A–B, 23A–B, 24A–B, 25A–B] and to what extent, if any, defendants may use the name "Dr. Seuss" in connection therewith.

Plaintiff's basic contentions are that defendants " * * * may not use plaintiff's name in any way in connection with the toy dolls because the toy dolls do not bear a sufficient relationship to the original work and differ in material respects from it"; and that "the toy dolls destroy the artistic integrity of plaintiff's original work and are so inferior in quality that the use of plaintiff's name in connection with them is disparaging and damaging to him." [P.T.O. 3 (p. 12)].

Additional details of the factual background of this litigation must be mobilized in order to consider the respective rights of the parties in proper context.

On September 1, 1949, Lorraine Lester entered into an option agreement with Liberty Magazine, Inc. [Pltf.Ex. 1] which, as amended on March 13, 1950 [Pltf.Ex. 2], permitted her, upon certain conditions to exploit short story material which had appeared in Liberty Magazine during the period 1924 to 1949 for use in connection with radio, television and motion pictures. [Lester, 850–51]. The exclusive license agreement provided in part:

"2. We shall make available for your inspection all short stories which have been published by Liberty. With respect to any stories selected by you of which we own all rights, your use

thereof may commence immediately. As to any other stories selected by you, we will endeavor at your request to obtain all rights which may be required, but in no event will you be licensed to use them hereunder until we have authorized such use." [P.T.O. Stip. 8].

On September 20, 1949, Miss Lester signed an agreement assigning the option agreement [Pltf.Ex. 1] to Lester-Fields Productions, Inc. [Pltf.Ex. 3], a company in which she was a principal. [Lester, 1248–49; P.T.O.Stip. 9].

In 1950, Miss Lester learned from Osborne B. Bond, the publisher of Liberty Magazine, that Liberty planned to cease publication [Lester, 851]. She thereupon entered into negotiations on behalf of Lester-Fields Productions, Inc. to acquire the magazine's "copyright library" [Deft.Ex. 67; Lester, 872]. On August 10, 1950, Miss Lester received a letter from Liberty [Pltf.Ex. 8] accepting her prior oral offer to purchase the "rights to all material contained in the Library of Liberty Magazine, Inc. from May 10, 1924 to July, 1950, inclusive * * *" [P.T.O.Stip. 13].

Thereafter, on September 8, 1950 Lester-Fields and Liberty Magazine, Inc. entered into an agreement [Pltf.Ex. 9] terminating the 1949 option agreement with Miss Lester and providing in part as follows:

"3. Liberty hereby sells, assigns and transfers to Lester any and all right, title or interest it may have in or to any and all of the stories and articles which have been published in Liberty Magazine from May 1924 to July 1950 inclusive, provided, however, that Liberty makes no representation as to the extent of its right, title or

bona fide purchaser for a valuable consideration. See Rossiter v. Vogel, 134 F.2d 908 (2nd Cir. 1943). Cf. Gibson v. Cook, 10 Fed.Cas. p. 314, Case No. 5,393 (C.C.N.D.N.Y.1850). As to the requirement of valuable consideration, see Venus Music Corporation v. Mills Music, Inc., 261 F.2d 577, 579 (2nd Cir. 1958) (consideration of $1 is not value); Rossiter v. Vogel, 134 F.2d at 911–912. See generally Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., 255 F.2d 518 (2nd Cir.), cert. denied, 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958); Latman, "The Recordation of Copyright Assignments and Licenses" (Study No. 19), in Studies On Copyright 761 (1963).

interest in and to such stories and articles."

The material referred to in that agreement included short stories, articles, cartoons and crossword puzzles which had appeared weekly in Liberty Magazine over a period of 26 years. [Lester, 1072–1073]. Approximately 17,000 literary properties were included [P T.O. Stip. 15; Lester, 1072–1073; Bond, 1228]. Lester-Fields also bought Liberty Magazine's permanent purchase record cards and checks covering the period of 1943 to 1950 [Lester, 1250; Bond, 1230–1231].

On October 5, 1950, Lester-Fields assigned this agreement [Pltf.Ex. 9] to George Lessner, Lorraine Lester, Robert Fields and Samuel H. Evans [Pltf.Ex. 10]. Fields subsequently assigned his interest to the others [Pltf.Ex. 11]. Thereafter, on November 10, 1964, this agreement [Pltf.Ex. 9] was assigned to Liberty Library Corporation. [Pltf.Ex. 12]. Thus, defendant Liberty Library Corporation is successor to all the literary assets of Liberty Publishing Corporation, publisher of Liberty Magazine in 1932 [P.T.O.Stip. 17].

In August 1964 Mr. Robert Whiteman called on Miss Lester in connection with film production. In the course of their conversation, he saw the 90 bound volumes of Liberty Magazine on her shelves; and, after discussion, suggested that he could help her make money by exploiting the literary properties contained in those magazine. [Lester, 1087]. Thereafter, Whiteman entered into an agreement with Liberty Library, whereby Whiteman represented Liberty "on an exclusive basis" in exploiting the material from defendant Liberty Magazine [Pltf. Ex. 13; Lester, 1086–1088].

Commencing in 1964, defendant Liberty embarked on a program of actively exploiting the material which had appeared in Liberty Magazine from 1924 to 1950. In the course of selecting material for sale or licensing, Whiteman came upon plaintiff's cartoons in the 1932 issues of Liberty Magazine [Lester,

1090; P.T.O.Stip. 19]. Whiteman checked the Liberty record cards and secured a copyright search on that material [Deft.Ex. 62]. After receiving expressions of interest in the cartoons, "as a matter of courtesy," Whiteman contacted Random House which referred him to plaintiff's agent, Mrs. Phyllis Jackson of Ashley Famous Agency. Whiteman showed her copies of the cartoons and of the copyright search and offered plaintiff the opportunity either to join with Liberty in exploiting the material or to repurchase the rights in the works [P.T.O.Stip. 20]. Whiteman agreed to keep her informed regarding any offers which he received with respect to the material [Deft.Ex. 24; Whiteman, 1406–1410; Jackson, 1166–1169]. Subsequently, Whiteman informed her by letter of December 15, 1964, that he had received an offer for reprint rights to the material [Deft.Ex. 20; Jackson, 1172].

Prior to the letter of December 15th, Mrs. Jackson contacted plaintiff who rejected defendant Liberty's offer [Jackson, 1169, 1171]. After the December 15th letter, Mrs. Jackson wrote to plaintiff advising him to have his attorney write to defendant Liberty in an effort to prevent exploitation of the cartoon material [Deft.Ex. 19; 63]. Thereafter, plaintiff's California attorney, Frank Kockritz, Esq., sent a telegram to defendant Liberty [Pltf.Ex. 39] advising it that plaintiff did not recognize Liberty's rights in the cartoons and reserving the right to institute a lawsuit.

After receiving the telegram, Whiteman consulted his attorneys and, on May 14, 1965, completed a transaction with Universal Publishing and Distributing Corporation [Whiteman, 1421–1433]. The agreement provided for licensing Universal to publish a paperback book of the Liberty "Dr. Seuss" cartoons [Pltf.Ex. 42; P.T.O.Stip. 21]. Universal subsequently wrote to plaintiff on June 6, 1966 asking plaintiff to retitle and revise his cartoons [Jackson, 1185]. Plaintiff rejected the proposal [Geisel, 1014–1015, 1017]; Mrs. Jackson in-

formed Universal; and plaintiff's attorney, Mr. Kockritz, sent a protest letter to Universal [Pltf.Ex. 43]. However, Universal went ahead and published a paperback entitled "Dr. Seuss' Lost World Revisited" [Deft.Ex. 56].

After publication, defendant Liberty again offered to sell its rights in the cartoons back to plaintiff [Geisel, 1018–1019; Abelman, 1443–1444]. This final offer of defendant Liberty to sell its rights in the cartoons back to plaintiff was suggested by Arthur F. Abelman, Esq., who had previously discussed the matter with plaintiff's agent, Mrs. Jackson [Abelman, 1443].[13]

Finally, in 1967, Whiteman undertook to sell merchandising rights to the cartoons [Jackson, 1187]. Whiteman, who was experienced in licensing and merchandising items, including toys [Whiteman, 1425–1427], decided to grant a license to manufacture dolls based on the cartoons [Whiteman, 1425]. Whiteman licensed defendant Poynter Products, Inc. because he had had successful dealings with Donald B. Poynter in the past and he considered Poynter to be " * * * a man of tremendous capabilities in the field of molding, sculpture, art, taste * * * " [Whiteman, 1427–1428]. The licensing agreement [Pltf.Ex. 18] was executed (on September 8, 1967), after Poynter had been shown the cartoons and informed of plaintiff's objection to the publication of the paperback book [Poynter, 664–667].

Donald B. Poynter was and is an experienced designer and manufacturer of toys, novelties and gift items, including items made for children [Poynter, 640–648]. He had previously designed a variety of items based upon works of well known artists [Poynter, 642–643, 649–651; Deft.Ex. 52–54]. He had also produced puppets [Poynter, 785]; "premiums," such as T-shirts and tags, given away by sponsors of children's radio and television shows [Poynter, 788]; theatrical sets [Poynter, 790];

and advertising artistic layouts for a large toy manufacturer [Poynter, 791].

In view of the protest telegram from plaintiff's attorney in 1964, Whiteman decided to submit everything done with respect to the dolls to Mr. Abelman. In fact, all meetings between Whiteman and Poynter took place in Mr. Abelman's office [Whiteman, 1430–1431]. In November 1967, Whiteman and Poynter came to Mr. Abelman's office to discuss design of the dolls [Abelman, 1446]. Poynter brought with him a hand sculptured styrofoam and papier-mâché model [Deft.Ex. 55] of one of the cartoon "characters" [from Pltf.Ex. 14B] which he had prepared from "rough" sketches [Poynter, 812]. Mr. Abelman found the prototype doll to be "reasonable acceptable and a faithful reproduction" [Abelman, 1446] and Whiteman agreed [Poynter, 813].

At the meeting in November, 1967, Mr. Abelman also advised Poynter " * * * that under no circumstances should he consult any book written by Dr. Seuss, watch any television program by Dr. Seuss or use any material of Dr. Seuss outside the Liberty drawings in preparing the drawings for his dolls, and I told him that when he watched those drawings he should look at them very carefully, reproduce them as close as he possibly could, taking into account the fact that you are moving from a two-dimensional medium of paper and publishing into the three-dimensional medium of dolls" [Abelman, 1446–1447]. In fact, the Court finds that Poynter used the cartoons *only* as they appeared in Liberty Magazine or in the paperback book [Poynter, 685, 810–811] in the preparation and design of the dolls.

After the meeting, Poynter prepared additional models and then went to Japan for six weeks to work on the dolls and choose a manufacturer [Poynter, 814]. By letter dated January 12, 1968 [Pltf.Ex. 19], Poynter authorized the manufacture in Japan of a set of

---

13. The Court, impressed by the credibility of Mr. Abelman's testimony, accepts it completely.

twelve small vinyl toy dolls designed from some of the creatures which appeared in the 1932 cartoons.

While in Japan and later when back in the United States, Poynter sculpted wax models of the dolls [Poynter, 815–819]. These wax models became the basis of the molds in which the dolls were manufactured [Poynter, 819]. During the design and manufacture of the dolls, minor changes were made so that the dolls which eventually were manufactured and sold were not precise copies of the original cartoons or of Poynter's initial transformation of the cartoons [Poynter, 688, 821]. These modifications reflected manufacturing techniques, cost and sales requirements, the availability and choice of plastics, aesthetic considerations [Poynter, 806, 807, 820–821], and deviations representing Poynter's three-dimensional interpretative transmutation of the two-dimensional cartoons [Poynter, 688, 705].

The dolls which were ultimately manufactured and sold [Pltf.Ex. 20–25A and B] consist of six different vinyl figures, each of which comes in two different colors. At an earlier stage, Poynter made and rejected a stuffed doll version of the figures [Poynter, 712–714, 716; Deft.Ex. 36].

At a meeting in February 1968, Abelman, Whiteman and Poynter carefully examined each doll and compared it with the cartoons. Abelman expressed the opinion that Poynter " * * * had done a very fine job of faithfully reproducing the cartoons in the doll medium, the three-dimensional medium" [Abelman, 1448, 1449]. Previously, Poynter had submitted to Abelman, by letter of December 30, 1967, prototypes of the "hang tag" [Pltf.Ex. 26] which was originally used with the dolls [Pltf. Ex. 45]. Abelman approved the tag and suggested that a copyright notice also be permanently imprinted in the base of each doll [Abelman, 1449–1450]. By letter dated February 16, 1968, Whiteman approved the dolls and the advertising material which he had viewed at the meeting [Pltf.Ex. 45].

Prior to March 12, 1968 (when the Court entered a temporary restraining order in this matter), defendants offered and sold the dolls using the name "Dr. Seuss" in the following ways:

1. It was engraved in very small letters on the vinyl bottom of each doll [Pltf.Ex. 20A and B] with the statement: "From Original Illustrations of Dr. Seuss © 1932 Liberty Library Corporation Copyright Renewed © 1966 Poynter Products Inc., Cincinnati, Ohio Made in Japan." This was done pursuant to the suggestion of defendants' counsel [Abelman, 1449–1450].

2. A round hang tag [Pltf.Ex. 26] tied around the neck of each doll stated, on one side: "From the Wonderful World of Dr. Seuss—an original Merry Menagerie"; and, on the other side: "This is my ——————— from Dr. Seuss' Merry Menagerie." Mr. Abelman approved this tag [1455, 1460].
(you name it)

The following are reproductions of both sides of this hang tag:

It is to be noted that the format of the name "Dr. Seuss" copies exactly the characteristic style of plaintiff's nom de plume as it appears in all his works.

As will be pointed out shortly, defendants discontinued the above wording and format after March 12, 1968.

3. The dolls were sold in a display carton [Pltf.Ex. 27]. On the base of this carton was the statement: "Dr. Seuss' Merry Menagerie" and the words "Lovable * * * Huggable"; on the backboard attached to the base of the carton was the statement: "From the Wonderful World of Dr. Seuss * * * Everybody Loves 'em * * * From Original Illustrations by Dr. Seuss." This carton, as well as the hang tag, also contained Liberty Library and Poynter Products copyright notices. The carton contained a statement that defendant Alabe is the exclusive U.S.A. distributor. Although Abelman did not recall whether he approved the display box, he did approve the title "From the Wonderful World of Dr. Seuss" and the remainder of the text used [Abelman, 1456–1457, 1460].

4. The dolls were advertised on a handbill [Pltf.Ex. 28] which stated: "Dr. Seuss' Merry Menagerie" and "From the Wonderful World of Dr. Seuss * * * Everybody Loves 'em."

5. This handbill also contained the following statement on its reverse side:

"The Newest, Hottest Character Toy Line of 1968 * * * Dr. Seuss" [Pltf. Ex. 29].

6. The dolls were advertised or referred to in the Official Directory of the 65th Annual American Toy Fair (March 1968) held in New York [Pltf.Ex. 30] as "Dr. Seuss" toys.

7. The dolls were referred to on invoices of defendants Alabe and Linder [Pltf.Ex. 32–33] as "Dr. Seuss' Merry Menagerie." Defendant Alabe's personnel and Poynter referred to the dolls as "Dr. Seuss dolls" [Poynter, 767].

From March 12, 1968, when a temporary restraining order was entered in this action, until April 9, 1968, when a preliminary injunction was entered, defendants did not ship any of the dolls for sale [Poynter, 832]. After the preliminary injunction was entered, defendants again began to offer the dolls for sale accompanied by revised labels and sales materials using the name "Dr. Seuss" in the following manner:

a. The hang tag tied around the neck of each doll [Pltf.Ex. 46] stated, on one side: "Wacky Merry Menagerie Everybody loves 'em"; and, on the other side: "Toys Created, Designed & Produced Exclusively by Don Poynter MERRY MENAGERIE Based on Liberty Magazine Illustrations by Dr. Seuss";

The following are reproductions of both sides of this revised hang tag:

It is to be noted that, subsequent to April 9, 1968, defendants discontinued using plaintiff's characteristic style of printing "Dr. Seuss".

b. The backboard of the display cartoon [Deft.Ex. 58] stated:

### "MERRY MENAGERIE

Toys Created, Designed & Produced Exclusively By Don Poynter

Based On Liberty Magazine Illustrations By Dr. Seuss"

————◆————

The name "Dr. Seuss" and the name "Don Poynter" were in the same size and style of type. The base section of the carton [Deft.Ex. 57] contained no mention of Dr. Seuss.

c. The revised handbill [Deft.Ex. 60] read:

"MERRY MENAGERIE. Toys Designed, Created & Produced Exclusively by Don Poynter Based on Liberty Magazine Illustrations by Dr. Seuss."

The name "Don Poynter" and the name "Dr. Seuss" were in the same size and style of type. In regular-size type in the handbill appeared the following copy:

"These lovable, huggable little creatures are from original illustrations by the celebrated author-illustrator Dr. Seuss. These early drawings were featured in the famous Liberty Magazine. Now, from these drawings Don Poynter, the inventor of 'The Thing', has created, designed and produced the newest, cutest, most charming 'merry menagerie' to 'hit' the market in many years."

*Extent of Defendants' Rights to Make the Dolls and To Use the Name "Dr. Seuss"*

■ As the owner of a copyright on the two-dimensional cartoons, defendant Liberty Library has the right to make three-dimensional figures or dolls therefrom or to license another (e. g., defendant Poynter Products) to do so. See King Features Syndicate v. Fleischer, 299 F. 533, 535 (2nd Cir. 1924) (owner of copyright upon cartoon sued manufacturer of toy horse " * * * fashioned after, labelled, and sold as * * * " "Sparky", the cartoon character; *held:* there is a claim for copyright infringement because a three-dimensional toy figure can be a copy of a two-dimensional cartoon); Nutt v. National Institute Inc., 31 F.2d 236 (2nd Cir. 1929)(lecture notes); Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc., 5 F.Supp. 808 (S.D. N.Y.1934) (owner of copyright upon cartoon sued manufacturer of "Betty Boop" doll; *held*: there is a claim for infringement because an exact copy is not required). As the Court of Appeals for this Circuit stated in *King Features Syndicate:*

"Copying is not confined to a literary repetition, but includes various modes in which the matter of any publication may be adopted, imitated, or transferred with more or less colorable alteration" (299 F. at 535).

■ A copyright upon a work in one medium may be asserted affirmatively by the copyright owner to obtain protection against infringement accomplished in a different medium. See, e. g., Lumiere v. Pathé Exchange, Inc., supra, 275 F. at 429 (drawing of a photograph); Bracken v. Rosenthal, 151 F. 136 (C.C. N.D.Ill.1907 (photograph of a piece of sculpture); Falk v. T. P. Howell & Co., 37 F. 202 (C.C.S.D.N.Y. 1888)(reproduction of photograph stamped in relief on leather of chairs); M. J. Golden & Company v. Pittsburgh Brewing Co., 137 F.Supp. 455, 457 (W.D.Pa.1956) (sketch of a plaque). Cf. Mazer v. Stein, 347

U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (lamp base of statuette).

■■■ A corollary of the rule just stated is that a copyright upon a work in one medium empowers the copyright owner to transform or copy the work into a different medium. More specifically, in this case the owner of the copyrighted two-dimensional cartoons has the right to make three-dimensional figures from the cartoons.

The manifest logic of the foregoing conclusion is demonstrated by assuming *arguendo* that the cartoons are in the public domain. In that suppositious situation, clearly defendants could copy the cartoons at will. In the present case, defendants, as owners of the copyrighted cartoons, cannot be in a less advantageous position.

Based upon a variety of legal theories set forth in the complaint, plaintiff's primary argument is that defendants' use of plaintiff's trade and pen name "Dr. Seuss" is wrongful.

### 1. The Lanham Act and Unfair Competition Claims

■■■ Plaintiff charges that defendants have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and are guilty of unfair competition and of violating Section 368–d of the New York General Business Law. The counterargument advanced by defendants is that a series of federal cases involving trademark infringement and unfair competition establishes the defendants' indisputable right to use the name "Dr. Seuss" to describe truthfully the nature and origin of their product, the dolls.

In this area of federal trademark law, the governing principle was expounded by the Court of Appeals for this Circuit when it declared in Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 36 (2nd Cir. 1962), aff'g, 190 F.Supp. 594 (S.D.N.Y. 1961), that registration of a mark:

"* * * bestows upon the owner of the mark the limited right to protect his good will from possible harm by those uses of another as may engender a *belief in the mind of the public that the product identified by the infringing mark is made or sponsored by the owner of the mark.* Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947) citing with approval, Prestonettes, Inc. v. Coty, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). The Lanham Act does not prohibit a commercial rival's truthfully denominating his goods a copy of a design in the public domain, though he uses the name of the designer to do so. Indeed it is difficult to see any other means that might be employed to inform the consuming public of the true origin of the design. Cf. Nims, Unfair Competition and Trade-Marks, sec. 130(a) (4th Ed. 1947).

Those cases involving sponsorship, whether trade-mark infringement or unfair competition, protecting the owner of the mark, are based upon a finding that *the defendant's goods are likely to be thought to have originated with, or to have been sponsored by, the true owner of the mark."* (Emphasis added.)

In *Prestonettes*, Coty, the owner of a registered trade-mark, sought to enjoin another from selling Coty's genuine products in smaller bottles and packages with Coty's name on it. The District Court issued a limited injunction which allowed the defendant to affix a label truthfully describing the relationship between defendant's product and Coty's product. The Court of Appeals issued a broad, absolute injunction restraining defendant from using Coty's marks *in any way* (as plaintiff requests in the case at bar). The Supreme Court reversed, holding that defendant could state the nature of the component parts of its product and the source from which it was derived. In doing so, defendant could use Coty's mark because " * * * [w]hen the mark is used in a way that *does not deceive the public* we see no * * * sanctity in the words as to prevent its [the mark] being *used to tell the truth"*

(264 U.S. at 368, 44 S.Ct. at 351) (Emphasis added).

In *Champion Spark Plug*, defendant repaired and reconditioned Champion's used sparkplugs and sold them using the name "Champion". The Supreme Court, noting that, in fact, the plugs *were* plaintiff's, stated:

> "Inferiority is immaterial so long as the article is clearly and distinctly sold as repaired or reconditioned rather than as new. The result is, of course, that the second-hand dealer gets some advantage from the trade mark. But under the rule of Prestonettes, Inc. v. Coty, * * *, that is wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product * * *. Full disclosure gives the manufacturer all the protection to which he is entitled." (331 U.S. at 130, 67 S.Ct. at 1139).

The doctrine of *Prestonettes* and *Champion Spark Plug*—that a trade name may be used by another as long as there is full and meticulously truthful disclosure communicating the actual character of the product—has been followed in a long line of decisions. See, e. g., Singer Mfg. Co. v. Briley, 207 F.2d 519, 522 (5th Cir. 1953)(rebuilt sewing machines); Volkswagenwerk Aktiengesellschaft v. Dreer, 253 F.Supp. 37 (E.D.Pa.1966) (converted automobiles); Scarves by Vera, Inc. v. American Handbags, Inc., 188 F.Supp. 255, 258 (S.D. N.Y.1960) (plaintiff's copyrighted linens used on defendant's handbags); Forstmann Woolen Company v. Murray Sices Corp., 144 F.Supp. 283, 290 (S.D.N.Y. 1956)(plaintiff's fabric used in defendant's garments). Cf. American-Marietta Company v. Krigsman, 275 F.2d 287, 289–290 (2nd Cir. 1960)(floor mops—no unfair competition unless a person's goods are sold " * * * in such a way as to make it appear that they come from some other source").

Another case that illuminates the problem before the Court is Chamberlain v. Columbia Pictures Corp., 186 F.2d 923 (9th Cir. 1951). There the Court affirmed the dismissal of a complaint by the heirs of Samuel Clemens against the defendant which had released a motion picture advertised as "A Story Only Mark Twain Could Tell," "Mark Twain's Tale of a Gamble in Hearts," and "Mark Twain's Favorite Story" and, therefore, assertedly conveyed the impression that Clemens had authored the picture. In fact, alleged plaintiff, the picture was of inferior quality; had only slight resemblance to Clemens' story; and was merely a "corny love story." The Court held that, because Clemens' story and, therefore, his name, were in the public domain, plaintiff had no monopoly in it and there could be no violation of plaintiff's rights; and that nothing in the advertisements could lead anyone to believe that the movie was plaintiff's business or that plaintiff was in any way connected with it (186 F.2d at 925). In the case at bar, plaintiff likewise has, to the extent that defendant Liberty Library owns all rights in the cartoons which appeared with the name "Dr. Seuss," no absolute monopoly in the name "Dr. Seuss."

With these guidelines as to the scope of the permissible use of the trade name "Dr. Seuss" in mind, the Court reaffirms, on the merits, that defendants violated Section 43(a) of the Lanham Act [14] by their "use" of the name "Dr.

---

14. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1964), provides:

"§ 1125. *False designations of origin and false descriptions forbidden*

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or

Seuss" "in connection with" the advertising and sale of the dolls *prior to March 12, 1968* (when this Court issued a temporary restraining order). See Geisel v. Poynter Products, Inc., 283 F.Supp. 261 (S.D.N.Y.1968) (opinion on preliminary injunction). In the exercise of the Court's discretion, see Parkway Baking Company v. Freihofer Baking Company, 255 F.2d 641, 649 (3rd Cir. 1958), the Court will make permanent that preliminary injunction.

On the present record, there is no showing of measurable damages because there is no proof of injury to plaintiff or of actual deception of a portion of the buying public. See Parkway Baking Company v. Freihofer Baking Company, supra, 255 F.2d at 648, and cases cited therein. However, if plaintiff has reason to believe that these deficiencies can be remedied without substantial delay, the Court will, upon appropriate motion and showing, appoint a master to ascertain the amount of any measurable damages.

The critical question for decision is whether defendants' "use" of the name "Dr. Seuss" *after April 9, 1968* (when this Court issued a preliminary injunction) violates Section 43(a) of the Lanham Act. The Court holds that defendants' activities *after April 9th* do *not* constitute "a false designation of origin, or any false description or representation" within the meaning of Section 43(a). Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., supra; Parkway Baking Company v. Freihofer Baking Company, supra. See also Smith v. Chanel, Inc., 402 F.2d 562 (9th Cir. 1968).

While defendants' prior activities created a false impression that the dolls were designed, manufactured or authorized by plaintiff, no such impression was intended to be, is, or can be, created by defendants' "use" of the name "Dr. Seuss" *after* April 9th.

No actual deception or confusion of, or tendency to deceive, the public is possible. Defendants have, in fact, satisfied the criteria of full and meticulously truthful disclosure. The phrase "based on" or the word "based," as used by defendants after April 9th, like the phrases "derived from," "suggested by," or "inspired by," accurately characterizes the genetic link between the cartoons and the dolls. Differences between the two are readily discerned [see Pltf.Ex. 52–52A, 53–53A, 54–54A, 55–55A, 56–56A, 57–57A]. The dolls are not exact reproductions or replicas of the cartoons. But these morphological differences are within the accepted limits in the licensed toy trade [compare Pltf.Ex. 17E and Deft.Ex. 37 ("Cat in the Hat"); Pltf. Ex. 51B and Deft.Ex. 28 ("Porky Pig"); Deft.Ex. 29 and Deft.Ex. 30–31 ("Mickey Mouse"); Deft.Ex. 32 and Deft. Ex. 33 ("Donald Duck")].

A comparison of other cartoon characters with the dolls or toys based on or derived from them discloses that some deviations between them, as between the cartoons and the dolls herein, are the inevitable result of the transmutation from two-dimensional drawings or cartoons to three-dimensional figures, manufacturing difficulties (including choice of material or medium), cost considerations, and aesthetic objectives (such as making the toy doll figures more "doll-like" or "huggable").

Plaintiff's experts, Charles M. Jones (of Metro-Goldwyn-Mayer's art department), Louis Lispi (art director of Walt Disney Productions), and Neil Estern (a noted sculptor) stated or implied that it is not possible to "base" a three-dimensional doll on a single two-dimensional cartoon drawing. This testimony is rejected by the Court as unsound and,

deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

indeed, belied by the demonstrated facts of this very case: the defendants have "based" their dolls on the plaintiff's cartoon characters. Despite the fantastic and imaginary character of plaintiff's cartoon animals [Geisel, 924–925], some of their "component parts" exist in nature [Geisel, 1020; Poynter, 688] or did in prehistoric times [Poynter, 688]. Consequently, Poynter was not working in primordial darkness when he had but one cartoon drawing upon which to base each doll.

To paraphrase the testimony of one of plaintiff's witnesses, the dolls are based on the cartoons in the same sense that a musical comedy may be based on a book despite obvious differences in the art forms and deviations in detail [Cerf, 328–329].

The Court does not adopt plaintiff's view that "based on" is a misrepresentation because it allegedly implies that plaintiff approved the dolls [Geisel, 1052–1053, 1055]. Section 43(a) of the Lanham Act cannot be read as permitting such an inference as to defendants' actions *after* April 9th without deleting the word "false" from that statute. No such application of Section 43(a) is justified.

■ As to the claims of unfair competition, plaintiff cannot recover for the "appropriation" of the cartoons themselves because defendant Liberty Library owns the copyright and plaintiff has no rights in them. See Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348, 351 (9th Cir. 1964), cert. denied, 379 U.S. 989, 85 S.Ct. 700, 13 L.Ed.2d 609 (1965).

■ Plaintiff argues that he is entitled to recover under New York law for the unauthorized use and appropriation of the name "Dr. Seuss" because of the false impression created that plaintiff sponsored or authorized defendants' dolls. See McGraw-Hill Book Company v. Random House, Inc., 32 Misc.2d 704, 225 N.Y.S.2d 646 (Sup.Ct. 1962); Triangle Publications v. Rohrlich, 167 F.2d 969, 972–974 (2nd Cir. 1948) ("Seventeen Magazine" and "Miss Seventeen Foundation Co."). Indubitably, one cannot attribute to an artist or author a work which the artist or author did not create or which substantially departs from his original work. See Granz v. Harris, 198 F.2d 585, 588 (2nd Cir. 1952); Clemens v. Belford, Clark & Co., 14 F. 728, 731 (N.D.Ill. 1883); Packard v. Fox Film Corporation, 207 App.Div. 311, 202 N.Y.S. 164, 166 (1923). Indeed, the New York courts have sometimes enjoined truthful references to another's trade or business name where there was a tendency to deceive the public. See Winthrop Chemical Co. v. Blackman, 246 App.Div. 234, 285 N.Y.S. 443, 444 (1936); Billy Rose's Diamond Horseshoe, Inc. v. Ros-Mar Catering Corp., 138 N.Y.S.2d 160, 161 (Sup.Ct. 1955) (intention to deceive found).

■ A salient fact in this case is that defendants own all rights, including the copyright, in the cartoons. That ownership must include some right to use the name "Dr. Seuss" because that name appeared on each of the pages of cartoons in Liberty Magazine. Although plaintiff did not design, manufacture or authorize the dolls, defendants have not, after April 9th, stated or implied that he did.[15] In fact, defendants have truthfully stated plaintiff's relationship to the dolls. The Court reiterates that there is no tendency to deceive, or actual deception of, the public by virtue of defendants' use of the name "Dr. Seuss" after April 9th.

■ Plaintiff also claims that he is entitled to an injunction under Section

---

15. While defendants' activities prior to March 12th can be considered to have been unfair competition, the scope of the injunction justified by this activity can be no broader than that warranted by defendants' violation of Section 43(a) of the Lanham Act. What the Court said with respect to the claim for damages under the Lanham Act likewise applies here: no proof of injury to plaintiff has been shown. The Court, in the exercise of its discretion, denies an accounting.

368–d of the New York General Business Law.[16] That statute requires a showing of some measure of customer confusion. Cue Publishing Co. v. Colgate-Palmolive Company, 45 Misc.2d 161, 256 N.Y.S.2d 239, 245–246 (Sup.Ct.N.Y.), aff'd, 23 A.D.2d 829, 259 N.Y.S.2d 377 (1965) (per curiam). That showing has not been made herein with respect to defendants' post-April 9th conduct. In the ordinary case of "dilution" of a trade name, the parties are not in any contractual relationship involving the subject matter of the claim of dilution. See e. g., Cue Publishing Co. v. Colgate-Palmolive Company, supra; Triangle Publications v. Rohrlich, supra.

In this case, however, the applicability of the concept of dilution is precluded by the contractual relationship between the parties. Plaintiff's rights in the trade name "Dr. Seuss" are monopolistic as to all the world *except* as to defendant Liberty Library, who acquired all rights in the cartoons from plaintiff in 1932. Consequently, defendants cannot be considered to be diluting plaintiff's trade name.

Finally, the Court finds that there has been no showing of a "[l]ikelihood of injury to [plaintiff's] business reputa-

tion." The Court, therefore, concludes that the claim under Section 368–d of the New York Business Law must be dismissed.

## 2. *The Right of Privacy Claim*

■ Plaintiff also seeks relief pursuant to article 5 of the New York Civil Rights Law, §§ 50, 51, which creates a "right of privacy."[17]

Plaintiff consented neither to the manufacture and sale of the dolls nor to the use of the name "Dr. Seuss" therewith [P.T.O.Stip. 42; Geisel, 999–1000, 1004, 1029; Jackson, 1190; Whiteman, 1119]. In addition, it cannot be doubted that the name "Dr. Seuss" was " * * * used * * * for advertising purposes or for the purposes of trade * * * " within the meaning of Section 51. Neyland v. Home Pattern Co., Inc., 65 F.2d 363, 364 (2nd Cir.), cert. denied sub nom. Curtis Publishing Co. v. Neyland, 290 U.S. 661, 54 S.Ct. 76, 78 L.Ed. 572 (1933).

■ However, plaintiff cannot succeed under the right of privacy statute because that statute does not protect an assumed or trade name. Jaggard v. R. H. Macy & Co., 176 Misc. 88, 26 N.Y.S. 2d 829, 830 (Sup.Ct. 1941), aff'd sub

16. Section 368–d of the New York General Business Law, which by its terms creates only an injunctive remedy, provides:

"§ 368–d. *Injury to business reputation; dilution*
Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

17. Section 51 of the New York Civil Rights Law relevantly provides:

"§ 51. *Action for injunction and for damages*
Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written

consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages. But nothing contained in this act shall be so construed as to prevent any person, firm or corporation, * * * from using the name, portrait or picture of any author, composer or artist in connection with his literary, musical or artistic productions which he has sold or disposed of with such name, portrait or picture used in connection therewith."

nom. Jaccard v. R. H. Macy & Co., 265 App.Div. 15, 37 N.Y.S.2d 570, 571 (1942).

In *Jaggard,* the plaintiff's actual name was "Ginette Jaggard" but she designed dresses under the assumed name of "Ginette de Paris". The court held that " * * * a name assumed for business purposes only * * *" is not within the protection of the statute. But cf. Gardella v. Log Cabin Products, 89 F.2d 891, 894 (2nd Cir. 1937) (dictum) (federal court applying New York law noted that the New York courts had not yet passed upon the question).

In the case at bar, plaintiff's actual name is "Theodor Seuss Geisel." He began using the name "Seuss" in 1925 and added the "Dr." to create the name "Dr. Seuss" in 1927 [Geisel, 909–910]. In fact, plaintiff stipulated that " 'Dr. Seuss' has been plaintiff's pen name and trade name since 1927 or 1928" [P.T.O. Stip. 35]. The Court holds that the name "Dr. Seuss" is an assumed name or pseudonym rather than a surname and is, therefore, not a protectible "name" within the meaning of Section 51 of the New York Civil Rights Law.

■ Defendants also argue that plaintiff cannot recover under the privacy statute because of the express statutory exception to Section 51. See Neyland v. Home Pattern Co., Inc., supra (exception creates an "implied license" to use the name to sell the artistic production). Cf. Rosenthal v. Kotler, 26 Misc.2d 947, 208 N.Y.S.2d 167 (Sup.Ct. 1960); Brociner v. Radio Wire Television, Inc., 15 Misc.2d 843, 183 N.Y.S.2d 743 (Sup.Ct. 1959). That exception is operative when three conditions are met: first, the plaintiff's name must be used by defendants " * * * with his literary * * * or artistic productions * * *"; second, the production must have been " * * * sold or disposed of * * *"; and third, the sale must have been " * * * with such name * * * used in connection therewith."

Clearly, the second and third conditions are met. Plaintiff "sold" the cartoons and the name "Dr. Seuss" appeared on

each of them. Neyland v. Home Pattern Co., Inc., supra (signed painting).

Plaintiff, however, contends that defendants have not satisfied the first condition for the reason that plaintiff "sold or disposed of" cartoons—*not* dolls —and the dolls are not substantially related to the cartoons. There is some superficial merit to this argument. However, the Court finds that the dolls are substantially related to the cartoons. Thus, the evident statutory purpose of the exception encompasses the circumstances of this case.

Decisions interpreting the statute have long held that, if a work is in the public domain, a concomitant of the right to copy that work is the right to use the name of the creator of the work in connection therewith, or, in other words, to state truthfully the creator's association with the product. Jaccard v. R. H. Macy & Co., 265 App.Div. 15, 37 N.Y.S. 2d 570, 571 (1942) (dress designer's name used in connection with patterns she designed); Rosenthal v. Kotler, supra; Brociner v. Radio Wire Television, Inc., supra; Shostakovich v. Twentieth Century-Fox Film Corp., 196 Misc. 67, 80 N.Y.S.2d 575, 577 (Sup.Ct. 1948) ("The lack of copyright protection has long been held to permit others to use the names of authors in copying, publishing or compiling their works"), affirmed without reaching merits, 275 App.Div. 692, 87 N.Y.S.2d 430 (1949); Ellis v. Hurst, 70 Misc. 122, 128 N.Y.S. 144 (Sup.Ct. 1910), aff'd without opinion, 145 App.Div. 918, 130 N.Y.S. 1110 (1911). See Clemens v. Belford, Clark & Co., 14 F. at 730.

The case at bar presents an *a fortiori* situation: the copyright and all rights in the cartoons are held by defendants. See Adrian v. Unterman, 281 App.Div. 81, 118 N.Y.S.2d 121, 127–128 (1952), affirmed without opinion, 306 N.Y. 771, 118 N.E.2d 477 (1954) (defendants had *no* property interest in plaintiff's name).

The Court, therefore, holds that all the conditions of the exception to Section

51 of the New York Civil Rights Law are met. That exception, as well as the trade name exception, requires dismissal of the right of privacy claim.

### 3. *The Defamation Claim*

██ Plaintiff argues that the dolls are "tasteless, unattractive and of an inferior quality" [Complaint, ¶ 41] and, therefore, sale of them with his trade or pen name holds him up to ridicule and contempt in his profession as a distinguished artist and author. See Clevenger v. Baker Voorhis & Co., 8 N.Y.2d 187, 203 N.Y.S.2d 812, 168 N.E.2d 673 (1960) (false attribution of authorship of inaccurate book may be libelous); Ben-Oliel v. Press Pub. Co., 251 N.Y. 250, 167 N.E. 432 (1929).

That plaintiff is a distinguished artist and author is not disputed [P.T.O.Stip. 6, 28–33]. The Court, however, rejects as unpersuasive and contrary to the preponderance of the credible evidence the testimony adduced in behalf of plaintiff that the dolls are "repellant" and of "inferior quality" [see, e. g., Cerf, 327, 602]. The Court finds that the execution of defendants' dolls was done with great care, skill and judgment by a qualified designer and manufacturer. In addition, the Court, on the basis of the entire record [see, e. g., Lispi, 194, 218–219; Poynter, 835] and of its own close examination of the dolls, finds that they are attractive and of good quality. There is, therefore, no defamation. See, e. g., Tracy v. Newsday, Inc., 5 N.Y.2d 134, 137, 182 N.Y.S.2d 1, 5, 155 N.E.2d 853 (1959); Nichols v. Item Publishers, 309 N.Y. 596, 601, 132 N.E.2d 860 (1956).

This claim must also fail because defendants' activities *after April 9th do* not imply that plaintiff created, designed or approved of the dolls. Cf. Shostakovich v. Twentieth Century-Fox Film Corp., 196 Misc. 67, 80 N.Y.S.2d at 578 (no libel because no implication of approval exists where work is in public domain).

### 4. *Conspiracy to Injure (Prima facie Tort)*

██ Plaintiff alleges for his fifth and final cause of action essentially that defendants have conspired to commit all the other acts alleged with an intent to injure plaintiff. This claim has not been established.

The Court finds, on the basis of the great preponderance of the credible evidence, that with respect to the exploitation of plaintiff's cartoons by Liberty Library, Liberty's dealings with plaintiff's agent, Mrs. Jackson, reflect the good faith of defendant Liberty; and that all of the actions of defendant Liberty and of its licensee Poynter Products were under bona fide advice of experienced and competent counsel who had been specifically requested to remain in the role of advising defendants by plaintiff's agent [Abelman, 1446–1449]. The Court reiterates that the designs and manufacture of the dolls were executed with great care and skill by persons with extensive experience.

Far from there being an intention to injure, the Court finds that defendants, at all stages of exploiting the Liberty Magazine cartoons, conducted themselves carefully and conservatively. There was no malice or intention to inflict injury on plaintiff. See Shostakovich v. Twentieth Century-Fox Film Corp., 196 Misc. 67, 80 N.Y.S.2d 575, 579 (wilful injury required).

It is important to note that plaintiff has not pleaded and proved special damages. See Rager v. McCloskey, 305 N.Y. 75, 80–81, 111 N.E.2d 214 (1953) (prima facie tort requires showing of " * * * actual temporal damages resulting from the false statements or the acts complained of"); Leather Development Corp. v. Dun & Bradstreet, Inc., 15 A.D.2d 761, 224 N.Y.S.2d 513 (1962) (per curiam), aff'd 12 N.Y.2d 909, 237 N.Y.S.2d 1007, 188 N.E.2d 270 (1963). There has been no showing that plaintiff was injured by defendants' conduct.

The prima facie tort claim must, therefore, be dismissed on the merits.

The same showing of good faith and reliance upon counsel which requires dismissal of the prima facie tort claim also requires dismissal, as a matter of discretion, of all claims for punitive damages. See Szekely v. Eagle Lion Films, 140 F.Supp. 843, 850–851 (S.D.N.Y.1956) (punitive damages only awarded for "outrageous conduct"), aff'd, 242 F.2d 266 (2nd Cir.), cert. denied, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957).

\* \* \*

Finally, plaintiff has offered no evidence of such participation by Alabe Crafts, Inc. and Linder, Nathan & Heide, Inc. in the accused acts as to make either of those defendants liable.

The Court denies costs to either party.

If any of the parties desire additional or supplemental findings of fact and conclusions of law, such additional or supplemental findings and conclusions shall be submitted to the Court and opposing counsel within five days from the date of the filing of this opinion.

Settle a judgment in accordance with the views expressed in this opinion.